THOMAS L. MADDEN, Appellant, *vs.* THE STATE OF KANSAS, Appellee.

The criminal code furnishes its own rules for determining the sufficiency of the pleadings recognized by it. By it the legislature attempted to simplify the system of criminal pleadings, and to close the avenues of escape made by the technicalities interwoven into the old sytsem ; and courts must give effect to its provisions according to the rules prescribed by it.

The requisites of an indictment are specified in sections eighty-nine and ninty of the criminal code, and are guides for the pleader, from which he ough: never to depart.

Section ninety-six of the criminal code, providing a large class of defects for the existence of which the indictment may not be quashed, limits the court in the application of the requirements of sections eighty-nine and ninety, and furnishes a different rule for its judgment than it had given to the pleader for his guidance.

*Held,* that an allegation in an indictment that " Thomas Madden on. " &c., " in the county of," &c., " unlawfully, maliciously and knowingly did prepare, mix, and mingle a large quantity, to wit : twelve grains of a certain poison called *cantharides,* commonly termed Spanish flies, with a certain quantity of wate", to wit : one gill, and a certain quantity of gin, with the intent that one Ann L. Smith, then and there being, should drink and swallow down the said *cantharides,* commonly termed Spanish flies, so prepared, mixed and mingled with the water and gin, aforesaid, with intent, then and there and thereby to do her, the said Ann L. Smith, an injury. And afterwards, to wit : on," &c., " in the county," &c., " the said Ann L. Smith, then and there not knowing the *cantharides,* commonly termed Spanish flies, aforesaid, to be so prepared, mixed and mingled with the water and gin aforesaid, did then and there drink and swallow down the said *cantharides,* commonly termed Spanish flies, so prepared, mixed and mingled with the water and gin aforesaid, by the said Thomas Madden, in manner aforesaid, whereby great injury was then and there done to the said Ann L. Smith ; that is to say, the said Ann L. Smith did, then and there and thereby, become greatly sick [and distempered in her body, so that for a long time the life of the said Ann L. Smith was despaired of, contrary to the form of the statute," &c., with the second count, charging the mixture to have been with whisky and water, and the third, with wine and water, does not state the facts constituting the offense " in plain and concise language, without repetition, as directed in the second clause of section eighty-nine of the criminal code.

Madden *v.* The State of Kansas.

Gin and water *construed* to be, in the usual acceptation in common language, drink; and *held*, that a criminal intent is clearly charged. Though at common law the offense should be charged to have been done " feloniously," yet *held*, that it is not a part of the plain language required by the code, and an omission therein *held* not to " tend to the prejudice of the substantial rights of the defendant upon merits," and not fatal.

But *held*, that under the sixth subdivision of section ninety-six, declaring that " for any surplusage or repugnant allegation, when there is sufficient matter alleged to indicate the crime and the person charged," the indictment shall not be' quashed. This indictment, though inartificially and clumsily drawn, must be sustained.

The crime charged is the mingling of poison with food, drink or medicine, with intent to injure, &c. The allegations that the accused mingled the poison, with intent that Ann L. Smith should drink the mixture, and of the taking of the poison, and its effects, *held* to be surplusage.

The criminal code, in section two hundred and sixteen, has adopted the common law rule, admitting no separation of the jury, and in section two hundred and fifty-eight, second subdivision, has made that one of the causes for a new trial.

A reason for the rule given, and rule laid down as to what would be such misconduct of the jury as would vitiate the verdict in criminal cases.

When the opportunity for improper influences, prejudicial to the accused, or in his favor, is afforded, if the verdict is against the accused, he is entitled to the presumption that the irregularity has been prejudicial to him, and it is incumbent on the state to show that no such injury could have occurred by reason of the irregularity.

It was shown, by affidavits filed, that the bailiff in charge of the jury was a portion of the time away from, and out of sight of, the building occupied by them; that a person went into the building and held communication with the jury, in absence of the bailiff; that the jury separated—part of them, unattended by an officer, left the building, conversed with a person from a back room; that information was given by the bailiff of the state of their deliberations, and that no sworn officer was in charge of the jury a portion of the time. In such a case, in the absence of proof that no injury to the accused could have occurred, by reason of these irregularities, *held*, that it was error in the court below to refuse to set aside the verdict and grant a new trial.

Where the jury are instructed that administering the poison is a part of the crime, *held*, error.

*Concurring as to all other questions, but in the following, Cobb, C. J., dissenting:*
An instruction to the jury " that if they believe, from the evidence, that defendant mixed, mingled and ministered *cantharides* to Ann L. Smith, with the intent to have carnal knowledge of her, and that as a result of such administering of *cantharides*, she, Ann L. Smith, received personal injury,

which is a fact for the jury to determine from the evidence, then the jury would be justified in finding the defendant guilty—the law presuming that he intended th: natural and probable consequences of his own act, unless he should rebut such presumption by evidence sufficient to satisfy the jury," leaves the jury to find whether or not the defendant performed the acts charged, and the administering of the poison, and upon an affirmative finding of those facts, decides the question of guilty intention to injure, against the accused, as a matter of law, giving as a reason that he intended the natural consequence of his own act. Both the ruling and the reason given for it, *deemed* erroneous.

The doctrine that " one is presumed to intend the natural and probable consequences of his acts," is not that the courts should, but that the jury might, presume the intention from the act. When the courts were allowed to infer such intention, the consequence of the act, when done, was not probable, but certain.

The only acts charged against the defendant was the mingling the poison, from which alone no legal inference could be drawn. Proof of the administering of it would be strong circumstantial evidence of criminal intent, and with all the facts, should have been submitted to the jury, with instructions to find the defendant guilty, if satisfied by the evidence of the criminal intent, as well as the other facts, and not otherwise.

At the November term, 1862, of the district court in the county of Shawnee, on the trial of this case, the court below charged the jury that if they believed, from the evidence, that defendant mixed, mingled and ministered *cantharides* to Ann L. Smith, with the intent to have carnal knowledge of her, and that as a result thereof she received personal injury, which is a fact for the jury to determine, from the evidence, then the jury would be justified in finding the defendant guilty—the law presuming that he intended the natural and probable consequences of his own act, unless he should rebut such presumption by evidence sufficient to satisfy the jury. The charge was duly excepted to.

The defendant below, at the proper time, asked the court to charge the jury that if the jury believe, from the evidence, that the defendant mixed *cantharides* with drink for Ann L. Smith, with the sole *intent* by that means to have carnal intercourse with her, then they must find the defendant not guilty ; which charge the court refused, and charged, "but if the jury

Madden *v.* The State of Kansas.

believe, from the evidence, that the defendant had a further intent, in mixing and administering the *cantharides,* to produce such imbecility of mind, or weakness of body of Ann L. Smith as to render her incapable of resistance; in that case, the so rendering her imbecile and weak would be an injury, within the meaning of the law, and the jury would be justified in finding the defendant guilty."

Other of the facts of the case appear in the opinion of the court.

*Brockway & Brockway and Elmore & Martin,* for appellant.

No brief of appellant's attorneys could be procured by the reporter.

*Gilchrist & Williams and Case & Case,* for respondent, submitted:

I. The indictment charges an offense. (§ 34, *Crim. Act.*) It charges that Madden mingled poison with gin, whisky, wine and water, with intent to injure Smith, and is a substantial compliance with the section, showing clearly, by proper descriptive averments, what Madden had to meet. (2 *Ohio S. R.,* 563; 3 *Ib.,* 362; 10 *Ib.,* 599, 615; *Code, p.* 251, § 94; *Wharton,* 4th ed., 364, 366, 299; *Wharton's Precedents,* 119, 471; *Warren's Forms,* 107.) Other words may be used. (*Whar.,* 4th ed., 374-5-6.)

The legislature has provided what shall be sufficient in an indictment, and for what reasons they may be quashed. (*Crim. Code,* §§ 87, 89, 90, 94, 95, 96, *pp.* 251-2.)

It states fully and conclusively the law, and leaves a court the small margin of *discretion,* contained in the fourth and fifth subdivisions of section ninety-five, and the seventh in section ninety-six, upon which to exercise its *discretion* in a motion to quash. The object was to simplify criminal pleadings and prevent the escape of the notoriously guilty, by abolishing "technical terms of art." If not so, why use

"plain and concise," in sections eighty-nine and ninety-five, and why introduce section ninety-four into our code, if that were not the object? These sections are intelligible; and, if so, the court *must* give them effect according to their *obvious* meaning, notwithstanding their provisions overturn the technical common law theories, constructed by the legal magicians that have gone before us. (*Whar.*, 4th ed., 370, *citing* 6 *Dana*, 339, *in Sneed vs. Com.*)

II. The indictment is not for a felony, but for malicious mischief. (*Wharton*, 4th ed., 2002, 1944, 1976; *Whar. Prec.*, 119, 471.)

Section three hundred, crimes act, defines and describes the term felony, when used in any part of the code, not that every offense punishable by "imprisonment in the penitentiary," or by "confinement and hard labor," is necessarily a felony. In manslaughter, the term, "feloniously," not necessary. (*Whar.*, 4th ed., 399, *note a and z*; *Ib.*, 400.) Yet our code prescribes punishment for those offenses to be "confinement and hard labor." (§§ 23 *and* 32, *Crimes Act.*) Madden may as well allege that it was an "infamous crime," and therefore it is defective, because we have not alleged that he "infamously" performed the act. (§§ 258, 301, *Code, pp.* 337, 345.)

III. It was in the discretion of the court to quash, or compel Madden to move an arrest of judgment. (*Whar.*, 4th ed., 519; *Barbour*, 349.) Therefore no ground for error. (1 *Cushing*, 189.) Discretion not triable. (*Elmaker vs. Buckley*, 16 *Serg. & Raw.*, 72, 77, 78; 4 *Wend.*, 249; 6 *Ib.*, 268; 1 *Monroe*, 115, 117, 118; 2 *Phil. Ev.*, 882, 883.) When courts will quash. (*Whar.*, 519 *to* 524.)

IV. The court did not err in refusing to compel Mrs. Smith to answer as to the *exact* locality of *other* pains than those which she had already described. The answer would disgrace the witness, and was the sole and only reason why the question was asked. Such questions need not be answered.

Madden *v.* The State of Kansas.

(2 *Phil. Ev.*, 939, *note* 592; 2 *Ib.*, *note* 593.) Such a question was impertinent and irrelevant; and even although going to the merits, as alleged by Madden, you shall not *coerce* where it would disgrace. (2 *Phil.*, 940.) Of this the court was the only party to decide from all the circumstances of the case; and having decided adversely to Madden, that the question would disgrace, if answered, is not that sufficient evidence to this court of that fact? Taken together with the bill of exceptions it must be conclusive.

V. Court did not err in allowing Smith to recall Deming. He was recalled upon the ground of newly discovered evidence, material to the case, and not cumulative, having been first examined as the physician who attended upon her during the sickness occasioned by the poison, and as an expert. This was matter of discretion, (2 *Phil. Ev.*, 878-9 ; 4 *Wend.*, 249,) for which error will not lie. (*See cases cited in third notes herein.*)

VI. Court did not err in excluding testimony of Gale. Both parties rested. Prosecution then introduced Deming as new evidence. Then Madden asked to introduce Gale, and stated what his evidence was. This was not in rebuttal, nor was it a justification, nor was it offered on the ground of newly discovered evidence, which, upon every legal principle, was inadmissible. They knew of the evidence, refused to introduce it. Again they ask, upon the partial opening of the case, that the case be fully opened, to admit what? Impertinent and irrelevant testimony. (2 *Phil. Ev.*, 882, 892.)

When counsel are fully aware of the materiality and existence of testimony, it should be excluded, (2 *Phil. Ev.*, 883,) and that they had a good reason for its non-production, and that it would conduce to change the verdict. (*Ib.*) The belief of Mrs. Smith, as to the *intention* of Madden, would not affect the verdict. (*Whar.*, 4th ed., 712.)

VII. The court did not err in refusing new trial, for what it may be granted. (*Crim. Code*, § 258; *Waterman on New Trials*, 66; *Ib.*, 80-1-2-3-4.)

Court will invariably refuse new trial where no injury has ensued. (*Ib.*, 85, 88, 89.)

The *abusing* the liberty taken or allowed, the gist of the case. (*Ib.*, 95.) If Madden was not injured, the court would not grant a new trial, and if the court see that justice has been done, and a new trial would produce the same result, new trial refused. (*Ib.*, 301.)

Surprise on a material point, which could not *reasonably* have been anticipated, and where want of *skill, care or attention* cannot be *justly* imputed, and *injustice* has been done, a new trial will be granted. (*Ib.*, 168.)

The *slightest* negligence will defeat it, and there must be *merits* in the case. (*Ib.*, 174.)

Affidavits must show he has sustained injury and set forth in detail. (*Ib.*, 176.)

Client bound by conduct of his advocate. (*Ib.*, 192.)

The judge may express *strong* opinions. (*Ib.*, 316, 317, 318; *See Ib.*, 63, as to talking with a jury.)

VIII. The court did not err in refusing to have testimony of Gilchrist, impeaching the integrity of jurors. He was the bailiff, having the jury in charge, and his statements of misconduct would inculpate himself. If the statements of jurors could not be received, inculpating themselves, certainly Gilchrist was not competent. (*Waterman*, 111, 125, 127.)

Upon grounds of public policy he was not competent. (2 *Phil. Ev.*, 165, 166, 167, 168; *Whar.*, 4th ed., 512; *Ib.*, 3155.)

IX. The charges are correct. (*Whar.*, 4th ed., 647, 649, 712; 1 *British Crown cases*, 361.)

By the Court, KINGMAN, J. The appellant assigns various errors of the court below, which will be noticed in the

opinion. The first is overruling the motion to quash the indictment.

The indictment has three counts substantially alike.

The first count is as follows: After the formal commencement, it charges "that Thomas Madden, on the twenty-first day of January, in the year of our Lord one thousand eight hundred and sixty-two, in the county of Shawnee aforesaid, unlawfully, maliciously and knowingly, did prepare, mix and mingle a large quantity, to wit: twelve grains of a certain poison called *cantharides*, commonly termed Spanish flies, with a certain quantity of water, to wit: one gill, and a certain quantity of gin, with the intent that one Ann L. Smith, then and there being, should drink and swallow down the said *cantharides*, commonly termed Spanish flies, so prepared, mixed and mingled with the water and gin aforesaid, with intent then and there and thereby, to do her, the said Ann L. Smith, an injury.

"And afterwards, to wit: On the twenty-first day of January, in the year of our Lord one thousand eight hundred and sixty-two, in the county aforesaid, the said Ann L. Smith, then and there not knowing the *cantharides*, commonly termed Spanish flies aforesaid, to be so prepared, mixed and mingled with the water and gin aforesaid, did then and there drink and swallow down the said *cantharides*, commonly termed Spanish flies, so prepared, mixed and mingled with the water and gin aforesaid, by the said Thomas Madden, in manner aforesaid, whereby great injury was then and there done to the said Ann L. Smith, that is to say, the said Ann L. Smith did then and there and thereby become greatly sick and distempered in her body, so that for a long time the life of the said Ann L. Smith was despaired of, contrary to the form of the statute, and against the peace and dignity of the state of Kansas."

The second count charges the mixture to have been with whisky and water, the third count with wine and water.

It is claimed that the indictment should have been quashed; because, first. It does not charge the accused with having mingled any poison with any food, drink or medicine by not averring that gin and water and wine and water were food, drink or medicine. Second. That the intent is not so stated as to apply to the mingling of the poison, but only to the drinking the same by Ann L. Smith. Third. That what is charged is not charged to have been done feloniously, and fourth. That the charge is not stated with sufficient certainty in this, that it does not appear whether it was for the mingling the poison with intent to kill and injure, under section thirty-four, or for administering the poison, under section thirty-three, of the act regulating crimes and punishments. Pleading, under the criminal code of this state, is a system furnishing its own rules for the determination of the sufficiency of any of the pleadings recognized by it. (§ 87.)

The legislature evidently designed by the code of crimina procedure to simplify pleadings, so that the technicalities which had become so interwoven with the old system, should no longer be used to defeat the ends of justice. It sometimes so happens that means which, at one period, may have been to promote justice and protect the rights of citizens, may become at other times and under other circumstances, the instrumentalities of defeating justice and perilling those very rights. At a time when an accused party, however limited his capacity, and whatever his ignorance of the law and proceedings in court might have been, was not allowed to make his defense by counsel. Courts were driven to rely upon nice technicalities and fine drawn distinctions, not always founded in reason, to set aside verdicts and quash indictments to protect innocence or prevent gross wrongs and hardships. These decisions once made, became law, and had become so numerous in the time of Sir Matthew Hale that, tender of life as he was, he complained "that this strictness is grown to be a blemish and an inconvenience in the law and the administration there-

of; for that more offenders escape by the over easy law given to exceptions than by their own innocence." (2 *Hale P. L.*, 193.)

The legislature has attempted to close these avenues of escape by the provisions of the code, whether wisely or not is not for us to consider. It is for courts only to give effect to its provisions according to the rules prescribed by it. It is to be regretted that those who have occasion to plead under the code, so often attempt to unite the simple rules of the code with the complex and cumbersome forms of the common law. Either may be good enough of itself, but from their very nature, both ought not to be attempted in one case; and it is from the vain effort to do so that most of the difficulty arises in determining upon the sufficiency of the pleadings. The nice technicalities and fine spun and often arbitrary distinctions of the old system will not harmonize with the "plain and concise language" which the code requires in stating the facts constituting an offense.

The code has specified, in sections eighty-nine and ninety, the requisites of an indictment, but has provided in section ninety-six a large class of defects, for the existence of which the indictment may not be quashed or set aside.

Now, it must be obvious to any one reading the indictment in this case, that it does not state the facts constituting the offense, in plain and consice language, without repetition, as directed in the second clause of section eighty-nine. But the sixth subdivision of section ninety-six declares, that for any surplusage or repugnant allegation, where there is sufficient matter alleged to indicate the crime and person charged, the indictment shall not be quashed or set aside.

The eighty-ninth and ninetieth sections are the guides for the pleader, from which he ought never to depart. The ninety-sixth section limits the court in the application of the requirements of those sections, and furnishes a different rule for its judgment than it had given the pleader for his guidance in

sections eighty-nine and ninety. By the sixth subdivision of the ninety-sixth section, if sufficient matter is alleged to indicate the crime and person charged, the indictment may not be quashed, although it may contain surplusage and repugnant allegations.

Now, surplusage and repugnant allegations cannot be that "plain and concise language, without repetition," directed to be used in section eighty-nine. Yet the court must disregard such surplusage, when called upon to pass upon the indictment, applying the criterian provided in sections eighty-nine, ninety and ninety-five, as explained and limited by section ninety-six, and we think it will be found that the indictment, though inartificially and clumsily drawn, must be sustained.

The whole offense is charged in the first part of the indictment, as we have divided it. The remninder and larger part of the indictment, in which the pleader alleges the taking of the poison, must, except the formal conclusion, be regarded as surplusage. The crime charged is the mingling poison with food, drink or medicine, with intent to injure Ann L. Smith. This is stated in the first part. The taking the poison and the consequences thereof, form no part of the crime, and must be held as surplusage, and if the facts therein stated should necessarily be proved to show that the mixture taken was poison, the court might, if required, instruct the jury that they were used for that purpose only, and formed no part of the offense.

We will notice the particular defects urged against the indictment. The court, jury and accused, must have known that gin and water is drink. That is the usual acceptation of the meaning of those words, and in that sense they must be taken. (§ 93.)

The intent seems also clearly charged. The pleader has unnecessarily stated that the accused mingled the poison with the intent that Ann L. Smith should drink the mixture, but has also charged that the intent was to do her an injury.

The only unlawful act charged against the accused is the mixing of the poison. The intent, which is an essential part of the crime, is charged as twofold: that his victim should drink it, and to do her an injury. It is claimed that the offense should have been charged to have been feloniously done. It may be true that this word may have been necessary at common law, but it certainly is not a part of the plain language required by the code. The reason for its use was the forfeiture which followed a judgment for the class of crimes, of which this is one. The principle having long ceased to be a part of our jurisprudence, it was fit that the word, necessary in the accusation, should be dropped. It can hardly be claimed, even if this be a defect, that it is one that "tends to the prejudice of the substantial rights of the defendant, upon the merits." We cannot see what proof it would have excluded against the defendant, or what admitted for him. Regarding, then, the last part of the indictment as surplusage, we think the charge is stated with that certainty, as to the offense and person charged, which is necessary under the code.

If the last part of the indictment was intended as an attempt to bring the case within the provisions of section thirty-three, as we think is possible, then the court should guard the jury in its charge against any such possible inference.

The case of *Lohman vs. The People*, (1 *Comstock*, 382,) is very similar in the principles involved as to the sufficiency of the indictment to this case, and there the court held the indictment good.

It will be convenient to pass now to the last error urged by the appellant, as the view we take of it will render it unnecessary to discuss at length the other errors relied on.

This ground is the misconduct of the jury. The affidavits filed show that the bailiff, in whose charge the jury retired to consider of their verdict, was a portion of the time away from the building in which their deliberations were held, and not in sight of it; that at least one person went into the building and

held communication with the jury while the bailiff was absent from and out of sight of the building, and that two of the jurors separated from the jury unattended by the bailiff or any other officer ; that one of them was absent from the house five minutes ; was seen going in the direction of Munger's stable, leading two horses and carrying a bucket on his arm. How long the other was separated does not appear. While still another juror was seen conversing with a person from the back room of the Chase House, and not attended by an officer. The bailiff informed one of the affiants how the jury stood while they were still deliberating, even giving the name of the juror who stood in favor of acquittal, and the bystanders generally seemed to know the state of their deliberations. It is apparent that the jurors had abundant opportunity for communication with persons other than the jurors, and that to some considerable extent, such intercourse was had.

No sworn officer was in charge of the jury portions of the time, and no explanations, by means of the bailiff or otherwise, is offered by the prosecution, to show the nature or character of the intercourse between the jurors and others, nor to what extent it was carried.

The common law admitted no separation of the jury, and our code has adopted the same rule, by providing, in section two hundred and sixteen, "that after hearing the charge, the jury may either decide in court or retire for deliberation. They may retire under charge of an officer sworn to keep them together in some private and convenient place, without food, except such as the court shall order, and not permit any person to speak or communicate with them, nor do so himself. unless by order of the court, or to ask them whether they have agreed upon their verdict, and return them into court, or when ordered by the court. The officer shall not communicate to any person the state of their deliberations."

And in the second subdivision of section two hundred and fifty-eight, providing, as one of the causes for a new trial,

Madden v. The State of Kansas.

"when the jury have been separated without leave of the court, after retiring to deliberate upon their verdict, or have been guilty of any misconduct tending to prevent a due and fair consideration of the case."

The reason why juries should not be allowed to have intercourse with others than themselves has been clearly and forcibly stated thus:

"The law has, with great pains, endeavored to procure for triers men above exception, who stood indifferent as they stood unsworn, and with yet more jealous care, provided that they should hear no evidence but what was relevant to the precise matter in controversy, and fit to bring their understanding and consciences to a proper conclusion thereon. If, after all these precautionary means, it permitted the triers to mix with those around them, to catch the partialities and prejudices of the friends and enemies to the parties, and to open their ears to all that might be said in relation to the matter under trial, the precautions were nugatory, and there was no security for an impartial verdict, founded upon the evidence. This part of the rule, as it admitted of no dispensation, so it permitted no exception unless such as was produced by an imperative necessity, and even then this was not allowed without great hesitation, and against the opinion of many sages of the law." (1 *Dev. & Bat.*, 500.)

There has been some diversity of ruling as to what would be such misconduct of the jury as would vitiate the verdict in criminal cases.

In Massachusetts, the supreme court say: "The result of the authorities is that when there is an irregularity which may affect the impartiality of the proceedings, as where meat and drink and other refreshments have been furnished by a party, or when the jury have been exposed to such influence as where they have improperly separated themselves, or have had communication not authorized, then, inasmuch as there can be no certainty that the verdict has not been improperly influenced,

23

the proper and appropriate mode of correction and relief is by undoing what has been improperly and may have been corruptly done." (*Com. vs. Roby*, 2 *Pick.*, 496.)

In New York, after having greatly relaxed the rules, the court of appeals, in the case of *Eastwood vs. The People*, (3 *Park. Cr. L.*, 25,) after a careful examination of the decisions in that and other states, and an able review of them, come back to the rule just quoted from Massachusetts, adding, however, a qualification that does not disturb the pinciple on which the Massachusetts case rests, that such verdict will, by such irregularity, be vitiated, unless it is affirmatively shown, on the part of the prosecution, that no injury to the prisoner could have occurred in consequence of the separation.

The great weight of authorities is in conformity with this principle.

In new states it is not always practicable to furnish the necessary conveniences so that the rigid rule of the common law can be enforced, but there can be no difficulty in a jury keeping together, and in keeping themselves free from any intercourse with others, or of a bailiff so taking charge of them, as that others shall not have an opportunity of conversing with them.

It is of the utmost importance that triers, who pass upon the lives and liberties of men, should so act that no possible suspicion can attach to them of having been in a position where improper influences, prejudicial to the accused, or in his favor, may have operated on their minds. Where the opportunity for such influences is afforded, if the verdict is against the accused, he is entitled to the presumption that the irregularity has been prejudicial to him, and it is incumbent on the state to show that no such injury could have occurred by reason of the irregularity.

The court erred in nct setting aside the verdict and granting a new trial for irregularity on the part of the jury.

There are several other errors complained of, but as most of them will not arise again, they need not be noticed.

The evidence is not given to us in the bill of exceptions. It would seem to us that the witness, Smith, ought to have answered the question proposed. It could not have disgraced her, as it seems to us, to have answered, let the answer be what it might; but we do not decide on this, as enough is not shown by the record to show whether it was a proper question for cross-examination.

The testimony of Gale was properly excluded. It was hearsay, and could not be admitted as evidence. It was no fact, showing either guilt or innocence, that Ann L. Smith held certain opinions. Much less could another testify that he had heard her express such opinions, unless it was done to impeach her testimony, and the record shows no ground laid for such examination.

The instructions seem to us to be the law applicable to such a case, as might have been made out under the indictment with one exception, which is this, that the jury are instructed that administering the poison is part of the crime. The crime is mingling with intent to kill or injure, and the administering forms no part of the offense.

This ought to be corrected in the new trial. We are not disposed now to comment on the practice of the court giving its reasons for giving and refusing instructions in the presence of the jury, as what was said in the case could not have prejudiced the jury, as the substance of what was said had already been given to the jury as law, and properly, as we think.

The judgment is reversed, and a new trial ordered upon the motion of the accused. And it is further ordered that the prisoner, Thomas Madden, be taken from the penitentiary, where he is now confined, and returned and delivered over to the jailor of Shawnee county, to be by him safely kept to abide the order of the district court of Shawnee county.

COBB, C. J.  I am compelled to differ with a majority of the court upon a single question in this cause, and believing

that question to involve a principle of importance, will briefly consider it. The learned judge who tried the cause instructed the jury "that if they believe, from the evidence, that defendant mixed, mingled and ministered *cantharides* to Ann L. Smith, with the intent to have carnal knowledge of her, and that as a result of such administering of *cantharides*, she, Ann L. Smith, received personal injury, which is a fact for the jury to determine from the evidence, then the jury would be justified in finding the defendant guilty—the law presuming that he intended the natural and probable consequences of his own act, unless he should rebut such presumption by evidence sufficient to satisfy the jury."

This instruction, as I understand it, leaves the jury to find whether or not the defendant performed the acts charged in the indictment, and the administering of the poison, and upon an affirmative finding of those facts, decides the question of guilty intention to injure, against the accused, as a matter of law, giving as a reason, that he intended the natural consequences of his own act.

Both the ruling of the court and the reason given for it, are, I think, erroneous.

"To the facts, the jurors are to respond; to the law, the judges;" and *intention* is as clearly a fact as are the acts done in pursuance of it.

The presumption that the accused intended the natural and probable consequences of his own acts, in my opinion, is not one of law, to be applied by the court, but of fact, to be weighed by the jury, with the other evidence in the case, and is strong or weak, according to the strength of the probability on which it is founded.

Starkey, speaking upon the presumption of intention, (2 *Stark. Ev.*, *p.* 739,) says: "This inference is usually one of fact, to be made by the jury by virtue of their knowledge and experience from all the circumstances of the case, but in this, as in some other instances, where the inference *necessarily*

arises from the facts, it is a conclusion of law, which the courts can deduce from the facts, without the intervention of a jury.

"It is a universal principle that a man shall be taken to intend that which he does or that which is the immediate and necessary consequence of his act.

"Thus in cases of homicide, the courts frequently infer malice from the facts, without an express finding of malice by the jury."

And I think that wherever the doctrine, that one is presumed to intend the natural and probable consequences of his acts, is stated in the books, by tracing the authorities it will be found that the doctrine held was not that the courts should, but that the jury might, presume the intention from the act; and that when the courts were allowed to infer such intention, the consequence of the act, when done, was not probable but certain.

This was clearly not a case of that kind. The only act the defendant was charged with in the indictment, was mingling the poison, and, most clearly, no legal inference could be drawn from that fact alone. But the administering of the poison, if proved, was strong circumstantial evidence to prove criminal intention, and I think the whole evidence should have been submitted to the jury, with instructions to find the defendant guilty, if the evidence satisfied their judgments of the criminal intention as well as the other facts in the case, and not otherwise.

As to all other questions in the cause, I fully concur with my brethren.