## Joseph W. Weimer v. Edward Bunbury.

*Constitutional law: Federal constitution: Summary process: Delinquent tax collectors.* The statute (*Comp. L. 1871*, § *1029*) authorizing summary process against delinquent tax collectors and their sureties is not an infringment of .the fourth and fifth amendments of the Federal constitution; these amendments are limitations·upon federal, and not upon state power.

*Constitutional law: Unreasonable searches and seizures.* Nor does it violate *Art. VI.*, § *26*, of the state constitution, prohibiting unreasonable searches and seizures; the main purpose of this provision was to make sacred the privacy of the citizen's dwelling and person against every thing but process issued upon a showing of legal cause for invading it; and the searches and seizures thereby inhibited are something quite different from an open and public levy upon property after the usual method of execution levies, and under apparent authority of law.

*Constitutional law: Due process of law.* Neither does the principle of this statute violate *Art. VI.*, § *32*, of the state constitution, providing that no person shall be deprived of his property without due process of law.

*Due process of law: Judicial process: Administrative process.* Due process of law is not necessarily judicial process; much of the process by means of which the government is carried on, and the order of society maintained, is purely executive or administrative, which is as much due process of law, as is judicial process.

*Power of taxation: Judicial proceedings.* Judicial proceedings are not by this provision of the constitution made a necessary prerequisite to the appropriation of property by the government under the power of taxation.

*Constitutional law: Intent: General provisions: Administrative proceedings.* An intent will no more be inferred from the general language of this constitutional provision, to prohibit such administrative proceedings as were well-known and sanctioned by long and general acceptance before the adoption of the constitution, than would an intent to abridge the judicial authority be inferred from the use of similar words.

*Bills of rights: American constitutions.* The bills of rights in the American constitutions have not been drafted for the introduction of new law, but to secure old principles against abrogation or violation; they are conservatory, rather than reformatory instruments.

*Day in court: Administrative proceedings.* While a day in court is a matter of right in judicial proceedings, in administrative proceedings it is otherwise, since they rest upon different principles.

*Summary process against delinquent tax collectors: Due process of law.* Summary process to enforce payment by a delinquent or defaulting tax collector, was not so unusual or unknown in this or other states when our constitution was proposed and adopted, as to be by implication excluded from "due process of law."

*Constitutional law: Summary process.* Whether the statute in question, though correct in principle, is not so objectionable in its present form as not to be sustainable, for the reason that the county treasurer, who is authorized to issue the process, has not in his office the record evidence that the default is that of the collector in not collecting the tax, rather than that of the supervisor in not delivering the roll to him :—*Quære ?*

30 MICH.—26.

WEIMER *v.* BUNBURY.

*Presumptions: Official duty.* It is not admissible to assume that one officer is in default, upon the mere presumption on behalf of another, that the latter has performed his official duty; but the presumption applies with like force in favor of each.

*Constitutional law: Statutes.* A legislative act will not be declared unconstitutional unless the point is presented in such form as to render its decision imperative.

*Summary process: Default: Tax collectors: Tax roll: Warrant.* Treating the city treasurer's official bond to the county treasurer, in question in this case, as an agreement that a summary execution may issue when a default occurs, its terms cannot be extended so as to subject the city treasurer and his sureties to this extraordinary process when the default is that of another officer; and the city treasurer is not responsible beyond the amount of taxes actually received by him, for the moneys called for by a tax roll to which no warrant is attached empowering him to enforce payment; he must have in his hands the statutory means for collection, before he can be in default for not collecting.

*Summary process: Recitals: Jurisdictional facts: Intendment.* The summary process provided for by the statute in question, being in derogation of the common law, and depending for its validity upon a strict conformity to the statute, must show on its face the facts which presumptively would make out a case of jurisdiction to issue it, and nothing can be taken by intendment in its favor.

*Summary process: County treasurer's warrant: Form.* The county treasurer's warrant in this case cannot be held sufficient upon a claim that the statute furnishes a form with which it complies; the statute gives no form, but simply provides who shall issue it, to whom it shall be directed, and what it shall command.

*County treasurer's warrant: Recitals: Jurisdictional facts.* A recital in such a warrant, simply that the city treasurer is in default "in the payment to the county treasurer of the taxes apportioned to the city of Niles for the year 1872," is a statement only of a legal conclusion, and is not a sufficient statement of jurisdictional facts to authorize its issuing.

*Summary process: Recitals: Tax collectors.* Nor do the subsequent recitals in the precept in question, that certain persons named became sureties on the bond of such city treasurer to the county treasurer, and that there remains now due and unaccounted for from said city treasurer a specified sum of money, support this preliminary declaration of the city treasurer's default; for the unpaid taxes might be city, school, highway, or special taxes, with which the county treasurer has no concern.

*Evidence: Errors that do not prejudice.* In an action against a sheriff for trespass in seizing upon such process the property of one of the sureties on the city treasurer's official bond, the admission of evidence on cross-examination of the defendant, that he had received from some of the other sureties a bond of indemnity for seizing this property, whether erroneous or not, could not have prejudiced him.

*Charge to the jury: Damages: Evidence.* The refusal to instruct the jury that they were not to consider, in making up their verdict, any damages which the plaintiff may have suffered by the breaking up of his business, will not be treated as error, upon a record which does not disclose any evidence that the plaintiff's business had been broken up, or indicate that the plaintiff sought to recover such damages.

*Measure of damages: Cash value: Charge to the jury.* The modification of a request to charge that the measure of damages was the cash value of the property, by striking out the word "*cash*," is held not error on this record, which does not show that any two standards of value were placed before the jury.

WEIMER v. BUNBURY.

*Requests to charge: Modifications: Presumptions: Jury.* There is no presumption that the jury have any knowledge of the requests to charge, except as they are communicated to them in the form of instructions; and the alteration of a request in a particular which might have confused the jury, if made with their knowledge, will not be treated as error where the request as modified and given was not erroneous, and it does not appear that the jury knew any modification of the request had been made.

*Heard July 16. Decided October 7.*

Error to Berrien Circuit.

*Edward Bacon* and *C. I. Walker,* for plaintiff in error.

*E. M. Plimpton* and *D. Darwin Hughes,* for defendant in error.

COOLEY, J.

Bunbury sued Joseph W. Weimer and Samuel Hess in trespass for taking and carrying away certain livery stock in his possession, and owned by him. The defendants, under their plea of the general issue, gave notice of the following facts in justification of the alleged trespass:

That in the year 1872, Thomas A. Bunbury was treasurer of the city of Niles; that the state and county taxes apportioned to said city for that year were as follows: three thousand three hundred and five dollars and eighty-seven cents to the first and fourth wards, and four thousand nine hundred and sixty-nine dollars and forty-seven cents to the second and third wards; that on receiving notice of such apportionment, said Thomas A. Bunbury, as principal, with Edward Bunbury and others, as sureties, made, executed and delivered to the defendant, Samuel Hess, then and still county treasurer of the county of Berrien, a bond, conditioned that the said Thomas should duly and faithfully perform the duties of his office as such treasurer, and that said county treasurer delivered to said Thomas receipts for said bond, as required by law; one of which was delivered by him to William J. Edwards, supervisor of said first and fourth wards, and one to Rufus H. Charles, supervisor of said second and third wards; that

after the delivery of such receipts to said supervisors, to wit: on the first Monday of December, 1872, they respectively delivered to said Thomas as such city treasurer, a tax roll for their respective supervisor districts, with the said state and county taxes properly extended thereon, with warrants attached thereto, commanding the said city treasurer to collect the said taxes and pay over to the county treasurer, on or before February 1, 1873; that said Thomas did not so collect and pay over, or render to the said county treasurer any statement or account, except to the amount of three thousand four hundred and two dollars and seventy-two cents, leaving four thousand eight hundred and seventy-two dollars and sixty-two cents unpaid and unaccounted for; and the said county treasurer, after demand, etc., issued the following warrant: "State of Michigan, Berrien county, ss.: To the sheriff of said county, greeting: Whereas, default having been made by Thomas A. Bunbury, city treasurer of the city of Niles, in said county, in the payment to the county treasurer of the taxes apportioned to said city of Niles for the year 1872; and whereas, there remains now due, unpaid and unaccounted for, the sum of four thousand eight hundred and seventy-two dollars and sixty-two cents; and whereas, Edward Bunbury, Burton Jarvis, George W. Platt, Joseph C. Larrimore, and Joseph S. Tuttle became sureties on the official bond of the said Thomas A. Bunbury as such treasurer, to Samuel Hess, the county treasurer of said county, and to his successors in office, for the payment of the taxes aforesaid: Now these are, therefore, in the name of the people of the state of Michigan, to command you to levy the said sum of four thousand eight hundred and seventy-two dollars and sixty-two cents, together with your fees for collecting the same, of the goods and chattels, lands and tenements of the said Thomas A. Bunbury, city treasurer as aforesaid, and of the said Edward Bunbury, Burton Jarvis, George W. Platt, Joseph C. Larrimore, and Joseph S. Tuttle, his said sureties, and to pay the same to

me, the said county treasurer of said county, and return this warrant to me, within forty days from the date hereof, according to law in such case made and provided. Given under my hand at Berrien, this 10th day of February, 1873. Samuel Hess, county treasurer." Which warrant was duly delivered to Joseph Weimer, who then was, and still is, sheriff of said county, and that by virtue thereof the said sheriff did levy upon the property in question, as the property of said Edward Bunbury.

On the trial, the plaintiff having proved the taking of the property from his possession, the defendants attempted to make out their justification, and for that purpose offered to prove the following several facts:

1. That the supervisors of the city of Niles made out two assessment rolls, as required by statute, for the year 1872;

2. That the board of supervisors equalized the assessment rolls of the county, including the two from the city of Niles, and apportioned the state and county taxes to be raised thereon, as required by law; and that such equalization and apportionment was duly certified, as directed by the statute, to the supervisors and the county treasurer;

3. That the supervisors of the city of Niles notified Thomas A. Bunbury, then the treasurer of said city, of the state and county taxes apportioned to the city of Niles, and this previous to the 15th of November, 1872, as required by law, and that by the 25th of November the treasurer gave bonds, with approved sureties, in double the amount of state and county taxes apportioned to said city, conditioned to perform the duties of his office, and that the plaintiff was one of the sureties upon said bond;

4. That this bond was filed with the county treasurer within the time limited by law, and receipts were given by him therefor, which receipts were delivered to the supervisors of the city of Niles;

5. That the supervisors of said city thereupon delivered to the city treasurer copies of the corrected assessment

rolls, with the taxes duly spread thereon, one of which copies had no warrant attached thereto, but the other had a warrant, regular in form, attached thereto, as the law requires;

6. That the city treasurer received these two rolls, and collected large amounts of moneys on each roll, but not the whole of the taxes upon either roll;

7. That the amount of state and county taxes on the roll with the warrant attached was three thousand three hundred and five dollars and eighty-seven cents, and on the roll without the warrant attached was four thousand nine hundred and sixty-nine dollars and forty-seven cents; that on the 3d day of February, 1873, there was paid to the county treasurer, as collected upon the two rolls, one thousand six hundred and forty-six dollars and thirty-nine cents, and on the fourth day of February a further sum of one thousand seven hundred and fifty-six dollars and thirty-three cents;

8. That the city treasurer failed to make return of the taxes collected upon either of said rolls, except as above, by the 1st day of February, 1873, or within a week thereafter, and failed to make a statement as to the taxes paid upon said rolls, or either of them, and of the delinquent taxes thereon, as required by the statute, or to do any thing else in relation thereto, and absconded from the state;

9. And that on the 10th day of February, 1873, the county treasurer, the defendant Hess, issued a warrant, under § *1029 of Compiled Laws of 1871*, for the sum of four thousand eight hundred and seventy-two dollars and sixty-two cents against the city treasurer and the sureties of his said bond, a copy of which warrant is appended to the notice with the plea in this case, that amount being the balance of the state and county taxes appearing on said rolls and not paid as aforesaid, a part of which balance has been collected and a part not; and that upon this warrant the sheriff, the defendant Weimer, made a levy upon the property in question, advertised and sold the same as

required by statute,—this being the trespass charged in the declaration.

To this offer the counsel for the plaintiff objected on the grounds: *First,* That the statute authorizing the county treasurer to issue such warrants was unconstitutional and void; and *second,* if the court should hold the statute valid, the facts did not justify the treasurer's warrant, inasmuch as one of the rolls was defective for the want of a supervisor's warrant attached thereto in compliance with the statute.

The circuit judge overruled the first objection, but sustained the second, and the evidence was not received.

The defendants being thus excluded from the justification, the parties respectively gave evidence of the value of the property, and the case was submitted to the jury. The defendants requested the court to instruct the jury:

*First,* That there is no evidence in the case that the defendant Hess was any party to the alleged trespass, and they should return a verdict of not guilty as to him;

*Second,* The rule of damages in the case is the cash value of the property at the time and place when it was taken, and not what the plaintiff may estimate it at;

*Third,* The jury are not to consider, in fixing the damages, any injury which the plaintiff may have suffered by the breaking up of his business.

The first request was complied with; the second and third were refused; the third, probably, because the judge regarded it as covered by an instruction already given by him, that the only question of importance for the jury was the value of the property, and that value the jury would determine from all the evidence in the case bearing on the point. This was given in the words of a request made by the plaintiff, except that the word "cash," which preceded the word "value" in the request, was stricken out by the judge. The jury returned a verdict in favor of Hess and against Weimer.

Although the ruling upon the constitutionality of the

statute was in favor of the plaintiff in error, the point is nevertheless in the case on this writ of error, since the justification depends upon the statute, and must fall to the ground if the statute has no validity.    The question has consequently been argued at length by counsel, and various constitutional provisions have been pointed out, with which the statute is supposed to conflict.

1.  It is said to violate the fourth and fifth amendments to the federal constitution.    There is nothing in this objection.    It is settled beyond controversy, and without dissent, that these amendments are limitations upon federal, and not upon state power.—*Barron v. Baltimore, 7 Pet., 243; Livingston's Lessee v. Moore, Ibid., 551; Fox v. Ohio, 5 How., 432; Smith v. Maryland, 18 How., 71; Pervear v. Commonwealth, 5 Wall., 475; Twitchell v. Commonwealth, 7 Wall., 321.*

2.  That it violates § *26, of Art. VI.,* of the state constitution, which prohibits unreasonable searches and seizures.    In support of this some cases are cited, but they seem not to be in point.    The searches and seizures which that provision of the constitution had in view were, we think, something quite different from an open and public levy upon property after the usual method of execution levies, and under apparent authority of law.    Its main purpose was to make sacred the privacy of the citizen's dwelling and person against everything but process issued upon a showing of legal cause for invading it.

3.  That it violates § *32, of Art. VI.,* of the state constitution, which declares that no person shall be deprived of his property without due process of law.    This is the most serious objection, and in its consideration it will be necessary to have in view the particular provisions of the statute under which the treasurer's warrant was issued.

Under our revenue system, the supervisors of townships and cities make an annual assessment of persons and property for the purposes of taxation.    The auditor general

apportions the state tax among the counties, and transmits notice of the apportionment to the clerks of the boards of supervisors respectively.—*Comp. L.*, § *996.* The supervisors determine the amount of county taxes, and apportion state and county taxes among the townships.—*Ib.*, § *997.* The clerk of the board makes two certificates of the amount apportioned to each township and ward, one of which he delivers to the county treasurer, and the other to the proper supervisor.—*Ib.*, § *998.* The supervisor proceeds to levy the taxes specified in the certificate,—*Ib.*, § *999;* and on or before November 15, notifies the township or ward treasurer of the amount, who must, on or before the 25th of November, give bond to the county treasurer, and his successors in office, with sureties, conditioned that he shall duly and faithfully perform the duties of his office.—*Ib.*, § *1000.* For this bond the county treasurer gives a receipt, —*Ib.*, § *1001;* which is presented to the supervisor, who thereupon delivers to the township treasurer a copy of the assessment roll, with the taxes all extended thereon, including not only the state and county, but also all township, school, highway and special taxes, and with a warrant attached, which shall specify particularly the several amounts and purposes for which said taxes are to be paid into the county and township treasuries, respectively.—*Ib.*, § *1002.* This warrant is to be under the hand of the supervisor, commanding the treasurer to collect from the several persons named in the roll the sums assessed against them, and to retain in his hands the amount receivable by law into the township treasury for the purposes therein specified, and to account for and pay over to the county treasurer the amounts therein specified for state and county purposes, on or before the first day of February then next; and it is to authorize the treasurer, in case any person named in the assessment roll shall neglect or refuse to pay his tax, to levy the same by distress and sale of his goods and chattels.—*Ib.*, § *1003.* The township treasurer must, "within one week after the time specified in his warrant

for paying the money directed to be paid to the county treasurer, pay to such county treasurer the sum required in his warrant, either in delinquent taxes or in funds then receivable by law."—*Ib.*, § *1018.* The provision under which the county treasurer issued the process now in question, is as follows: "If any township treasurer, ward collector, or other collecting officer shall neglect or refuse to pay to the county treasurer the sums required by his warrant, or to account for the same as unpaid, as required by law, the county treasurer shall, within ten days after the time when such payment ought to have been made, issue a warrant under his hand, directed to the sheriff of the county, commanding him to levy such sum as shall remain unpaid and unaccounted for, together with his fees for collecting the same, of the goods and chattels, lands and tenements of such township treasurer, ward collector, or other collecting officer, and their sureties, and to pay the said sums to such county treasurer, and return such warrant within forty days from the date thereof."—*Ib.*, § *1029.*

It is, perhaps, not necessary to notice statutes further, except to say that under the charter of the city of Niles there are no ward collectors or treasurers, but the duty of collecting for the whole city is devolved upon the treasurer of the city.

The position taken by the defendant in error is, that the words "due process of law," made use of in the section of the constitution last referred to, imply, in the words of *Judge Bronson,* "a prosecution or suit, instituted and conducted according to the prescribed forms and solemnities for ascertaining guilt or determining the title of property." —*Taylor v. Porter, 4 Hill, 147.* In this case there has been no prosecution or suit; the county treasurer has adjudged the case without a hearing, and issued final process to seize property in enforcement of his conclusion. Such summary process, it is said, which gives the party whose property is seized no opportunity to contest the claim set up against him, cannot be due process of law.

There is nothing in these words, however, that necessarily implies that due process of law must be judicial process. Much of the process by means of which the government is carried on and the order of society maintained is purely executive or administrative. Temporary deprivations of liberty or property must often take place through the action of ministerial or executive officers or functionaries, or even of private parties, where it has never been supposed that the common law would afford redress. One in whose presence a felony is committed is in duty bound to restrain the the offender of his liberty without waiting for the issue of a magistrate's warrant,—*4 Bl. Com., 292-3;* and the traveler who finds the public way founderous crosses the adjacent field without fear of legal consequences.—*Holmes v. Seeley, 19 Wend., 507; Campbell v. Race, 7 Cush., 408.* Our laws for the exercise of the right of eminent domain protect parties in going upon private grounds for the preliminary examinations and surveys. It may be said that in none of these cases is the deprivation final or permanent, but that is immaterial. The constitution is as clearly violated when the citizen is unlawfully deprived of his liberty or property for a single hour, as when it is taken away altogether. Estrays were at the common law taken up and disposed of without judicial proceedings,—*1 Bl. Com., 297;* and our statutes have always made provisions under which, if they were complied with, the owner of stray beasts might be deprived of his ownership by *ex parte* proceedings not of a judicial character. Where an individual creates with his property a public or private nuisance, the common law permits the citizen who suffers from it to become " his own avenger, or to minister redress to himself."—*3 Bl. Com., 5, 6;* and he may even destroy the property if necessary to the removal of the nuisance.—*Rung v. Shoneberger, 2 Watts, 23; Inhabitants of Arundel v. McCulloch, 10 Mass., 70; Wetmore v. Tracy, 14 Wend., 250.* The destruction by the act of the party is as lawful as if it had been preceded by a judgment of a competent court, the only differ-

ence being that the party when called upon to justify the
act must in the one case prove the facts warranting it,
while in the other he would be protected by the judgment.
No one probably would dispute the levy of distress by a
private individual being due process of law in the cases in
in which the law permits it.—*3 Bl. Com., 6.* It is true
that the party whose property has been distrained may con-
test the proceedings by suit in the common-law courts, but
he fails if they prove to have been regular. The military
law affords abundant illustration on this point. The prin-
ciples on which it is administered have but little in common
with those which control judicial investigations, and the
process under which men are restrained of their liberty
under it is sometimes very summary and even arbitrary.
But this law is just as much subject to the constitutional
inhibitions as is the code of civil remedies.—See *Ex parte
Milligan, 4 Wall., 2.* But the proceedings for the levy
and collection of the public revenue afford still better
illustration. Almost universally these are conducted with-
out judicial forms, and without the intervention of the
judicial authority; the few cases in which statutes have
required the action of courts being exceptional. Where
such action is not required, the proceedings are regarded as
purely administrative, and any hearing allowed to parties
in their progress has not been in the nature of a trial, but
as a means of enlightening the revenue officers upon the
facts which should govern their action. This has been so
from time immemorial, and it has never been supposed that
the tax-payer had a constitutional right to resist the tax
because he had never had any judgment against him on a
judicial hearing to fix its amount.

There are, unquestionably, cases in which expressions
have been used implying the necessity for a common-law
trial before, in any instance, a man can be deprived of his
property; but they will be found on investigation to be
cases calling for no such sweeping statement. If any court
has ever decided that judicial proceedings are of constitu-

tional necessity in appropriating property under the power of taxation, the case has not been brought to our attention, and has been overlooked in our investigations. This would be most extraordinary if the necessity existed, for tax systems similar to our own have prevailed ever since our government was founded, and it cannot be said that tax laws are usually so popular as to disarm every person of any legal objections which he might suppose available to relieve him of their burdens. On the contrary, no laws are contested more vigorously, and with none are people more critical in looking after defects and infirmities. It may be safely asserted, without fear of contradiction, that if the collection of the revenue could only be made through legal proceedings, the true principle would not have been left to so late a discovery, but the wheels of government would long ago have been blocked by litigious parties until an entirely new system could be substituted. And it need hardly be said that any new system in which courts should be made the administrators of the revenue would necessarily be so cumbrous, and so subject to impediments and delays, as to make a constitutional provision requiring it a great public inconvenience.

There is nothing technical, or, we think, obscure, in the requirement that process which divests property shall be due process of law. The constitution makes no attempt to define such process, but assumes that custom and law have already settled what it is. Even in judicial proceedings we do not ascertain from the constitution what is lawful process, but we test their action by principles which were before the constitution, and the benefit of which we assume that the constitution was intended to perpetuate. If there existed, before that instrument was adopted, well-known administrative proceedings which, having their origin in a legislative conviction of their necessity, had been sanctioned by long and general acceptance, we are no more at liberty to infer an intent in the people to prohibit them by implication from any general language, than we should be

to infer an intent to abridge the judicial authority by the
use of similar words.    The truth is, the bills of rights in
the American constitutions have not been drafted for the
introduction of new law, but to secure old principles against
abrogation or violation.    They are conservatory instruments
rather than reformatory; and they assume that the existing
principles of the common law are ample for the protection
of individual rights, when once incorporated in the funda-
mental law, and thus secured against violation.

We are, therefore, of necessity driven to an examina-
tion of the previous condition of things, if we would un-
derstand the meaning of due process of law, as the consti-
tution employs the term.    Nothing previously in use, re-
garded as necessary in government and sanctioned by usage,
can be looked upon as condemned by it.    Administrative
process of the customary sort is as much due process of
law as judicial process.    We should meet a great many
unexpected and very serious embarrassments in government
if this were otherwise.    The words, it has very justly been
said, " were intended to secure the individual from the ar-
bitrary exercise of the powers of government, unrestrained
by the established principles of private rights and distrib-
utive justice."—*Per Johnson, J.,* in *Bank of Columbia v.
Okely, 4 Wheat., 235.*    It has been said, with special
reference to process for the collection of taxes, that " any
legal process which was originally founded in necessity, has
been consecrated by time, and approved and acquiesced in
by universal consent, must be considered an exception to
the right of trial by jury, and is embraced in the alterna-
tive 'law of the land.'"—*State v. Allen, 2 McCord, 56.*
In *High v. Shoemaker, 22 Cal., 363,* the same doctrine was
held in a revenue case.    In *Rockwell v. Nearing, 35 N. Y.,
308,* which is quoted for defendant in error as sustaining
his position, the opposite view is very distinctly taken.
" There are," says *Porter, J.,* " many examples of summary
proceedings which were recognized as due process of law at
the date of the constitution, *and to these the prohibition*

*has no application."* Yet the same judge, in a previous portion of his opinion, had quoted with approval the general language of other cases, which might be understood as implying the necessity of a judicial hearing to due process of law; and the case is an illustration of the danger of deducing general principles to govern one class of cases, from isolated expressions made use of in deciding another class. A day in court is a matter of right in judicial proceedings, but administrative proceedings rest upon different principles.    The party affected by them may always test their validity by a suit instituted for the purpose, and this is supposed to give him ample protection.  To require that the action of the government, in every instance where it touches the right of the individual citizen, shall be preceded by a judicial order or sentence after a hearing, would be to give to the judiciary a supremacy in the state, and seriously to impair and impede the efficiency of executive action.

But it may be argued that the warrant in question is not a necessary or usual process under revenue laws.  It can not be said, however, that summary process to enforce payment by a defaulting collector is very unusual.  The territorial act of 1833 required the auditor to report such a defaulter to the governor, and unless he settled up and paid all arrearages within thirty days after the report, he was to be removed from office.—*Code of 1833, p. 169.* In the *Revised Statutes of 1838, p. 87, § 12,* the provision was introduced for the issue, by the county treasurer, of a warrant to the sheriff in the nature of an execution against the collector.  This provision had been in force for twelve years before the present constitution was proposed, and we are not informed that its validity had ever been questioned. Similar statutes had existed in other states.  In Massachusetts and New York, from which we derived the larger portion of our statutes, they had been in force for a period dating back of the organization of our state government; and in neither state does it seem to have been disputed,

that such summary process was "due process of law." The legislature of this state, by providing for it in repeated enactments, have shown their conviction of its necessity; and the constitutional convention, though they made several express provisions to ensure justice and equality in matters of taxation, passed this legislation by in silence. We think, therefore, that summary process to enforce payment by a delinquent collector cannot be held forbidden.

What makes me pause upon this statute is, not the general principle which is relied upon, but some peculiarities in the statute itself, which distinguish it from that of 1838, in a very marked degree. Under the *Statutes of 1838, p. 85, § 6*, the county treasurer had in his office a record of the various collectors, and of the delivery to them of their several tax warrants, so that when a return failed to be made he had record evidence of the default upon which to issue his precept. Under the present statute, the county treasurer has no such evidence. He takes bond from the township treasurer, and the latter subsequently receives the tax roll from the supervisor. When the time arrives for making return, if it fails to be made, the county treasurer cannot officially know whether it is the supervisor who is in default in not delivering the roll to the township treasurer, or the latter in not collecting and making return. He may inquire and obtain hearsay evidence, but there is nothing in the statute to indicate that under any circumstances he is to withhold his warrant if the return fails in being made, even though he be informed that through the neglect or blunders of the supervisor a roll capable of enforcement has never come to the township treasurer's hands. He is, then, to assume the township treasurer to be in default, and proceed to execution accordingly. But there can be no basis for the assumption that the default is that of the treasurer, except the presumption on behalf of the supervisor that a public officer has performed his duty, and it would be a curious jumble of presumptions, if we were to presume that one

public officer had failed in his duty, because we could not presume that another had.     The question would be very pertinent why the presumption, if indulged at all, should support the supervisor rather than the treasurer; and this inquiry would be specially forcible in this case, where the township treasurer must wait the action of two supervisors, either of whom, retaining his tax roll, might place the treasurer in apparent default.     It must be confessed, there were statutes in some other states, previous to the adoption of our constitution, which made as little provision for the protection of the rights of the treasurer and his sureties, as this does; but it seems to me an anomaly that execution should thus issue, without the officer issuing it having before him record evidence of any description whatever, of the facts which show default, and where, consequently, he must proceed upon hearsay, or upon a mere presumption that another officer has performed his duty, when the same presumption, if indulged at all, should protect the treasurer himself.     And I think it will be found, on investigation, that these statutes have had their origin in provisions whereby the same officer who issued the tax warrant, and to whom it was to be returned, was the one authorized to issue summary process when the warrant which he had himself issued, and of which he kept a record in his office, failed of being returned; and that they have assumed their present form through inadvertent legislation, when more complex provisions, and a larger official force were found necessary in tax proceedings.     But it is not, perhaps, so important to determine this, as it is to call attention to this legislation as being, in its present form, objectionable, whether capable of being sustained or not. It would seem that where the county treasurer does not himself issue the tax warrant, the least that can be required is, that he should have in his office the township treasurer's receipt as evidence of its delivery to him.

The circuit judge held the statute constitutional, but that plaintiff in error was not justified by its provisions.

30 MICH.—28.

If he was right in this, any consideration of the constitutional question might have been waived, upon the ground that a legislative act should not be declared unconstitutional unless the point is presented in such form as to render its decision imperative.—*Ex parte Randolph*, *2 Brock.*, *447*; *Frees v. Ford*, *6 N. Y.*, *177*; *Hoover v. Wood*, *9 Ind.*, *287*; *Mobile & Ohio R. R. Co. v. State*, *29 Ala.*, *573*. It is not imperative, so long as it appears that the case can be disposed of in only one way, whether the law is held valid or not. But as the general principle of this statute has always been deemed important in this state, we have thought it proper to express our opinion of its constitutional validity, pausing only when we reach a provision which seems defective in its protection of individual rights, and which, whether constitutional or not, it may fairly be presumed the legislature might be inclined to modify on their attention being called to it. Waiving, therefore, the question of the validity of this provision, we proceed to show why, in our opinion, the county treasurer's warrant was not justified by its terms.

The various provisions of the statute which lead to the issue of the county treasurer's warrant have already been stated or referred to. It was necessary in this case that the state and county taxes should be properly apportioned to the city of Niles, and that the city treasurer should have executed to the county treasurer the proper bond. The supervisors must subsequently have delivered to the city treasurer tax rolls with state, county, city, school and other taxes extended thereon, with warrants annexed giving him proper legal authority to collect the same, and directions as to what disposition he was to make of the several taxes he should collect. All these were necessary prerequisites without which the city treasurer could not be subjected to this summary process. Treating the city treasurer's official bond to the county treasurer as an agreement that a summary execution may issue when a default occurs, its terms cannot be extended so as to subject the city treasurer and

his sureties to this extraordinary process when the default is on the part of another officer. The city treasurer is not in default if he never receives the tax roll, and though he may be liable in a proper form of action for any tax moneys actually received by him, it is clear that he does not agree, by his bond or otherwise, to become responsible for all the moneys called for by the tax roll if no warrant accompanies it empowering him to enforce payment. In other words, he must have in his hands the statutory means for collection before he can be in default for not collecting. And when summary process of this nature is issued against him, it must show on its face all the facts which are necessary to constitute a default; for nothing can be taken by intendment in favor of a proceeding like this, which is in derogation of common-law principles, and therefore must depend for its validity upon a strict conformity to the statute. As in the case of the process of all other inferior and special tribunals not proceeding according to the course of the common law, the county treasurer's warrant must show the facts which presumptively would make out a case in which he had jurisdiction to issue it.—*Nichols v. Walker, Cro. Car., 394; Rex v. Manning, Burr., 377; Rex v. Mayor, etc., of Liverpool, Ibid., 2244; Frary v. Dakin, 7 Johns., 75; Mills v. Martin, 19 Johns., 33; People v. Koeber, 7 Hill, 39; Dakin v. Hudson, 6 Cow., 221; Bridge v. Ford, 4 Mass., 642; Barrett v. Crane, 16 Vt., 246; Cloutman v. Pike, 7 N. H., 211; Chandler v. Nash, 5 Mich., 409; Platt v. Stewart, 10 Mich., 260; Newsom v. Hart, 14 Mich., 233.* In this case the county treasurer has no record back of the warrant which shows the default, and consequently any question which might be made regarding the support of the warrant by such a record is not in the case. Nor do we think there is any foundation for the argument which is made, that the county treasurer's warrant must be held sufficient because the statute furnishes a form with which it complies. The statute gives no form; it merely says

the warrant shall be directed to the sheriff, and shall command him to levy the sum unpaid and unaccounted for, together with his fees, etc.; but he is to issue it only " if any township treasurer, ward collector or other collecting officer shall neglect or refuse to pay to the county treasurer the sums required by his warrant, or to account for the same as unpaid, as required by law." These facts are to precede the issue of the warrant, and these or something equivalent must somewhere appear.

What does the county treasurer's precept show in this case? It begins with a recital that the city treasurer is in default "in the payment to the county treasurer of the taxes apportioned to said city of Niles for the year 1872." Here is the statement of a legal conclusion without the recital of a single fact to support it. It is a judgment without preliminary accusation or finding. It is difficult to conceive of a proceeding more defective in the statement of jurisdictional facts. Nothing is said of any tax rolls, nothing of any tax warrants; but upon the naked fact that taxes have been apportioned to the city of Niles, which have not been paid over to the county treasurer, the sheriff is to proceed to levy and collect the same of the property of the city treasurer and his sureties. Nor do the subsequent recitals in the precept support this preliminary declaration of the city treasurer's default. The subsequent recitals show two facts only; that certain persons became sureties on the bond of the city treasurer to the county treasurer, and that "there remains now due and unaccounted for from the said Thomas A. Bunbury, as such city treasurer as aforesaid, the sum of four thousand eight hundred and seventy-two dollars and sixty-two cents." Now the city treasurer might be in default for this amount without being liable to this process, for the taxes unpaid might be city, school, highway, or special taxes, with which the county treasurer has no concern. It may be doubtful, therefore, if this statement would show a default even if it

were previously recited that tax rolls and warrants were duly delivered; but it is clear it could be of no service in the absence of such a recital.

It follows that the county treasurer's precept was not fair on its face; that is to say, it did not contain recitals sufficient to show that it was lawfully issued. If we could go back of it, and beyond the county treasurer's office, to find support in facts not recited, it could not be aided. To one of the tax rolls it was admitted no tax warrant was attached, and the defendant's offer of evidence conceded that the city treasurer had paid to the county treasurer a sum in excess of the state and county tax called for by the warrant attached to the other. If, therefore, we could treat the county treasurer's process as divisible in its application to the two tax rolls,—upon which we express no opinion,—it would not aid the defendant in this case, for it is impossible to say on this record that the deficiency was not wholly upon the roll to which no warrant was attached; and which, therefore, could not, as already stated, be a basis for this summary process. There was no showing, and no offer to show, that the payments to the county treasurer were made with a designation of the roll or rolls upon which they were to apply, or that they were applied otherwise than generally to the amount apportioned to the city.

It being thus seen that the justification wholly failed, it only remains to examine the errors which are assigned upon the admission of evidence, and the charge of the court regarding the measure of damages.

It is objected that the plaintiff in error, being on the stand for examination as to the value of the property seized, was permitted to be asked on cross-examination whether he did not have from some of the sureties a bond of indemnity for seizing this property. We do not perceive how an answer to this question could have aided the plaintiff below. Its tendency would rather be to aid the defendant by showing him to be indifferent to the result, and thus giving

more weight to his testimony in his own behalf. In no aspect of the case can we perceive that the defense could have been prejudiced by the question and answer.

It is also assigned for error that the court refused to instruct the jury that they were not to consider, in making up their verdict, any damages which the plaintiff may have suffered by the breaking up of his business. We have not been able to discover in the case any thing to make this instruction applicable. The record does not show that evidence was given of the plaintiff's business having been broken up. Perhaps that might be inferred from the statement that "the property taken was his livery stock," but it would not be a necessary inference. And as nothing in the record indicates that the plaintiff sought to recover damages for the breaking up of his business, it does not clearly appear that the defendant was entitled to the instruction.

The only remaining error relied upon is, that the court, when requested to instruct the jury that the measure of damages was the cash value of the property, struck out the word "*cash*" from the instruction before giving it. The record as it bears upon this point is peculiar. Both parties requested instructions which would put the cash value of the property before the jury as the measure of damages. They both seemed to admit that that was the proper standard, and why the court modified the request is not apparent. Nothing in the evidence indicates that any two standards of value were placed before the jury. The testimony related to the value of the property, making no discrimination between cash value and credit, or dicker, or any other value. The judge, in instructing the jury, spoke generally of *value*, as the witnesses did, and it is not very apparent what right either party had to assume that the cash value was something different from the standard of any or all of the witnesses, or, if it was, that the jury had been furnished with any means of discrimination. At any rate, we cannot assume on this record that the court committed an error in

declining to call the attention of the jury to a distinction which it does not appear that they had the means of drawing from the evidence. If it be said that the alteration of the instruction requested was an intimation to the jury that they might award something else than the cash value, the conclusive reply is, that the jury may not have known any thing about the change which the judge made. Requests for instruction are not always,—perhaps not in a majority of cases,—read in the hearing of the jury. They are handed up to the judge, who marks them "given," or "refused," or modifies them as he thinks proper and then gives them. There is no presumption that the jury have any knowledge of the requests, except as they are communicated to them in the form of instructions.

The judgment must be affirmed, with costs.

The other Justices concurred.