# IN THE MATTER OF THE APPLICATION OF EMMA L. KAIPU for a Writ of *Habeas Corpus* for MIKALA KAIPU.

## December 21, 1904.

*Construction of Health Laws:* The laws of Hawaii for the arrest and isolation of persons afflicted with the disease of leprosy, in common with similar laws of the States of the Federal Union, providing for the arrest and isolation of persons afflicted with contagious or infectious diseases, do not require judicial proceedings for the ascertainment of the existence of the diseases in question.

*Same.—Administrative Process.—Summary Action:* Administrative process, based on the necessity of summary action, is authorized by such laws.

*Administrative Process.—Habeas Corpus:* In the case of an investigation by the Board of Health of the question of the existence of the disease of leprosy in any person, such person is not entitled to notice and an opportunity to be heard, but may, if an unfavorable decision is pronounced, have the question of fact and of the right of the authorities to detain him, tried under proceedings for *habeas corpus.*

*Construction of Health Laws.—Practice:* The Hawaiian laws, in authorizing the Board of Health to isolate person afflicted with the disease of leprosy who shall be deemed capable of spreading it, furnish sufficient authority to the Board, with physicians in its membership, to investigate the question of the existence of the disease in such persons and their capability of spreading it, with such other medical assistance as it may consider necessary.

*Construction of Laws.—Long Usage:* Long usage under a vague expression of a statute or its silence on some points where others are given, may supply the defect, especially if consistent with the statutory directions.

*Involuntary Servitude.—13th Amendment:* To require persons held in detention under health laws to perform light work for their own comfort, is not within the 13th. Amendment to the Constitution.

*Same:* Whether the statute providing that the Board of Health

may require from patients in detention such reasonable amount of labor as may be approved by the attending physicians, is within the 13th Amendment to the Constitution, *quaere?*

*Practice Under Health Laws:* The conclusion of medical examiners called upon by the Board of Health for their opinion, that a contagious disease exists in a certain person, is a fact which justifies such Board in isolating such person.

*Habeas Corpus:* Demurrer to Return.

C. W. Ashford, Attorney for Petitioner.

Lorrin Andrews, Attorney-General of the Territory, for Respondent.

DOLE, J. The petitioner in this case is the daughter of the person whose detention is complained of. She alleges that Mikala Kaipu is held and detained in custody by the President of the Board of Health of the Territory of Hawaii,—Mr. L. E. Pinkham, who is also the Executive Officer of such Board; that she is so held upon the claim that she is afflicted with the disease of leprosy and with the intent to remove her forcibly and against her will to the leper colony on the Island of Molokai. The petitioner further alleges, on belief, information and observation, that her mother is not afflicted with such disease and has not been legally subject to detention and transportation as a leper even though the laws and regulations on the subject in force in the Territory are valid; that her said mother has not been publicly or legally placed on trial for examination to ascertain the fact whether or not she is afflicted with such disease, and has never received notice of any hearing or examination into such question, or any opportunity to produce evidence in her own behalf upon such question, nor has any other person, in her behalf, been afforded such notice or opportunity; and claims that such action taken and proposed by the Board of Health is unwarranted in law and contrary to her rights under the Constitution of the United States.

The writ was issued and the President of the Board of

Health presented his return, in which he states in substance that the said Mikala Kaipu is detained in custody by him, as Executive Officer of the Board of Health, under the laws of the Territory requiring the segregation of persons afflicted with the disease known as Chinese leprosy; that she has been pronounced a leper by the proper medical authorities; and admits that it is his intention to transport her to the settlement of Molokai.

The counsel for the petitioner filed his exceptions and demurrer to the return, contending that the return does not present any issue either of law or of fact, but only legal conclusions without setting forth the facts upon which such conclusions are based, and states no reason or justification for the detention of the said Mikala Kaipu.    Counsel for petitioner offers three leading reasons in his brief for the support of his demurrer, first, that the Hawaiian statutes do not provide means of carrying out the isolation and detention therein authorized of leprous patients who shall be deemed capable of spreading the disease of leprosy; second, that there has been no legal examination or trial of the question of the said Kaipu's being afflicted with such disease and she is therefore deprived of her liberty without due process of law; third, that the statute for the isolation and segregation of lepers provides for their involuntary servitude.

The right to detain persons afflicted with contagious and infectious diseases is provided by the laws of all civilized countries, being based upon the necessity of summary action for the protection of the public health in regard to such persons as are liable, on being afflicted with contagious and infectious diseases, to spread such diseases among others.    This right in almost all civilized countries is given by legislatures to administrative officers and boards who are authorized to arrest persons afflicted with such diseases and remove them to such places as may be provided where they can be taken care of without danger to the rest of the community.    The laws of different States

allow such action to be peremptory and without notice. The same quality of authority exists in regard to nuisances which are dangerous to the public health. These nuisances are generally called to the notice of the owner or occupier of the premises where they exist, with an order for their suppression. If such order is disobeyed the nuisance is suppressed by the authorities and the owner or occupier charged with the expenses thereof. Although in rare cases, such as in the statutes of Pennsylvania, it is required that the owners or occupiers of such premises may, on receiving such notice, apply for a stay or modification thereof, in which case they shall be allowed a hearing and an opportunity to put in evidence, yet in cases relating to the affliction of individuals with contagious or epidemic diseases, thereby becoming a menace to the community, I find no case in which an opportunity to be heard or a provision for a judicial trial of the question of the existence of such disease is provided by statute, or is considered by the court as essential to the legality of the summary action of the proper officers.

In regard to the deprivation of the liberty of individuals by virtue of law, the cases recognize a distinction between judicial and administrative process, both in the authority of the officers executing them and in the status of the conclusions upon which such action is based. Under judicial proceedings a trial affecting the property or liberty of an individual cannot be had unless such individual has notice thereof and an opportunity to be heard, and the conclusion of such a trial is final, subject only to appeal. But an administrative proceeding does not require that notice shall be given to the person under consideration, and the conclusion of the examination or trial is only final if it is correct in fact, and it may be contested in other proceedings, in which case it must, in order to its validity, be proved to have been according to the facts. *City of Salem v. Eastern Railroad Co.,* 98 Mass. 441, 443, 447; *People v. Board of Health,* 140 N. Y., 1.

Judge Cooley, in the case of *Weimer v. Bunbury* (30 Mich. 210), said also, in referring to the words "due process of law":

"There is nothing in these words, however, that necessarily implies that due process of law must be judicial process. Much of the process by means of which the government is carried on and the order of society maintained is purely executive or administrative. Temporary deprivations of liberty or property must often take place through the action of ministerial or executive officers or functionaries, or even of private parties, where it has never been supposed that the common law would afford redress. One in whose presence a felony is committed is in duty bound to restrain the offender of his liberty without waiting for the issue of a magistrate's warrant; and the traveller who finds the public way founderous crosses the adjacent field without fear of legal consequences. Our laws for the exercise of the right of eminent domain protect parties in going upon private grounds for the preliminary examinations and surveys. It may be said that in none of these cases is the deprivation final or permanent, but that is immaterial. The Constitution is as clearly violated when the citizen is unlawfully deprived of his liberty or property for a single hour, as when it is taken away altogether. * * * Where an individual creates with his property a public or private nuisance, the common law permits the citizen who suffers from it to become 'his own avenger, or to minister redress to himself'; and he may even destroy the property if necessary to the removal of the nuisance. The destruction by the act of the party is as lawful as if it had been preceded by a judgment of a competent court, the only difference being that the party when called upon to justify the act must in the one case prove the facts warranting it, while in the other he would be protected by the judgment."

Mr. Justice Field, in *Barbier v. Connolly*, (113 U. S. 27, 31-2), referring to the Fourteenth Amendment to the Constitution of the United States, remarked:

"But neither the amendment—broad and comprehensive as it is—nor any other amendment, was designed to interfere with the power of the State, sometimes termed its police power, to prescribe regulations to promote the health, peace, morals, education, and good order of the people. \* \* \* Regulations for these purposes may press with more or less weight upon one than upon another, but they are designed, not to impose unequal or unnecessary restrictions upon any one, but to promote, with as little individual inconvenience as possible, the general good. Though, in many respects, necessarily special in their character, they do not furnish just ground of complaint if they operate alike upon all persons and property under the same circumstances and conditions. Class legislation, discriminating against some and favoring others, is prohibited, but legislation which, in carrying out a public purpose, is limited in its application, if within the sphere of its operation it affects alike all persons similarly situated, is not within the amendment."

The case of *Yamatawa v. Fisher*,—known as the *Japanese Immigrant Case* (189 U. S. 86, 100), appears at first sight to support the contention of counsel for the petitioner. An alien had illegally landed in the United States, and within the time allowed by the statute, was arrested and was about to be deported by the agent of the Treasury. Under an application for a writ of *habeas corpus*, the Supreme Court decided on appeal, that the petitioner was entitled to notice and an opportunity to be heard on the question of his deportation. The court, referring to the case of *Nishimura Ekiu v. United States*, 142 U. S. 651, 659, and other Supreme Court cases, said:

"It has been settled that the power to exclude or expel aliens belonged to the political department of the government, and that the order of an executive officer, invested with the power to determine finally the facts upon which an alien's right to enter this country or remain in it, depended, was 'due process of law, 'and no other tribunal, unless expressly authorized by law to do

'so, was at liberty to re-examine the evidence on which he acted, or to controvert its sufficiency.' "

This power of an executive officer to "determine finally the "facts upon which an alien's right to enter this country or "remain in it, depended," places such determinations in the class of judicial findings in distinction from administrative findings, and because of such judicial status, no other tribunal, unless expressly authorized by law to do so, might re-examine or controvert the evidence on which such executive officer acted, and because thereof, the person to be affected by such action was entitled to notice and an opportunity to be heard.

The counsel for the petitioner has presented an able brief on this bearing of the subject, drawing his illustrations and authorities mainly from cases dealing with the arrest and incarceration of insane persons. He has produced no cases relating to the arrest of individuals and their deprivation of liberty on account of being afflicted with contagious or infectious diseases. This absence of such citations is significant. To my mind, the precedents in regard to the incarceration of alleged insane persons, do not control or strongly influence questions relating to the arrest and detention of persons found, or supposed to be afflicted with contagious or infectious diseases. Insanity is not contagious or infectious. An insane person at liberty is no menace to the public except as he may be liable to paroxysms of violence. The necessity, therefore, for summary action does not usually arise in such cases, and there is every reason that one complained of as insane, should, if not a raving maniac, have an opportunity of proving himself sane, and no reason against it. There is little doubt but that one violently insane, would be summarily arrested and detained, in any community, even though the trial of the question of the insanity be proceeded with later.

In regard to the contention that "no legislative authority "exists for the making of any rules and regulations by the Board "to provide for the certification by physicians  *  *  * · of

"the leprous condition of a patient," the petitioner's counsel is probably correct in saying that the rules and regulations specifically authorized by the statute, do not relate to the matter of determining whether an alleged leper is in fact afflicted with the disease and is capable of spreading it. The respondent, in his return, does not claim that the said Mikala Kaipu is held in custody by virtue of any rules and regulations of the Board, but by virtue of the laws of the Territory of Hawaii on the subject. By these laws the authority is conferred on the Board and it is its duty to ascertain whether suspected persons are in fact afflicted with the disease and are capable of spreading it. It is doubtful whether any rules and regulations are necessary to enable the Board to do this. The Board has very properly called upon members of the medical profession to assist it in such investigations and has adopted the conservative practice of requiring an agreement of four out of five of such medical examiners as to the existence of the disease in any suspected person, and as to his capability of spreading it. The Board might legally decide such questions through a direct examination by its own members, allowing that its membership includes physicians. The decision is, in fact, by the Board on the advice and assistance of the examining physicians; but it is not in any way bound by such advice. Upon ascertaining the fact of such disease existing in any person and his capability of spreading it, the authority of isolation vests in the Board This practice has been followed for a long time with the acquiescence of the community.

"Where the statute speaking on some points is silent as to others, usage may well supply the defect, especially if it is not inconsistent with the statutory directions, where any are given; or where the statute uses a language of doubtful import, the acting under it for a long course of years may well give an interpretation to that obscure meaning and reduce that uncertainty to a fixed rule." *Dunbar v. Roxburghe, 3 Cl. & Fin. 335, 353.*

In addition to such investigation, the Board requires a special examination by a bacteriologist, by which the presence of the disease, if present in fact, is said to be a matter of scientific demonstration.

Such proceedings are consistent with the theory of administrative procedure and reasonably guard the interests of the suspected person. Counsel for the petitioner complains that under this method, the liberty of the individual is entirely dependent upon the character of the examiners for integrity and skill. This is, to a certain extent, the case, and it is also to some extent the case with all trials and investigations both administrative and judicial. When a man is tried for his life on a charge of murder, his life is dependent, to an extent, on the integrity and intelligence of both the court, the jury and the witnesses. In all human transactions, the personal element figures to a greater or lesser extent and cannot be avoided. The legislature might have provided a judicial trial for investigating the question of the existence of this disease in any individual, but it has not done so and it is within its power to make the examinations and proceedings in these matters administrative, according to all the cases and authorities I have been able to refer to. In deprivations of liberty or property under administrative proceedings, the person affected always has the right of an investigation through a writ of *habeas corpus,* in which the question of fact and the findings of the administrative process may be fully examined and overruled or supported. Under a judicial trial he would not have that right, only the right of investigation as to the jurisdiction of the tribunal exercising such judicial functions and the conformity to law of its actions and conclusions.

The counsel for the petitioner contends that however proper summary action may be in the menace of such diseases as are extremely contagious and infectious and swift in their progress, yet it is not properly applicable to a disease that is only moderately contagious, like leprosy. I feel that this is a con-

sideration to be addressed rather to the law-making power than to a court. Such power has in its laws for the suppression of leprosy in these Islands, followed the precedent of other communities, in their legislation against the more contagious and more rapidly fatal diseases. The public danger from leprosy is serious enough to justify our legislation on the subject and summary action under it, even though the disease is less contagious than smallpox and slower in its action, and it is supported by the analagous action of other communities when the public health is threatened by causes, the eradication of which can be most effectively carried out by such measures.

The third point raised by the demurrer is the claim that the law under which Mikala Kaipu is held, provides for the involuntary servitude of the patients and that, therefore, the whole law is unconstitutional.

The statute says on this point, (Section 991, Penal Laws): "The Board of Health or its agents may require from patients "such reasonable amount of labor as may be approved of by the "attending physicians." The Bill of Rights granted by Kamehameha III in 1839 gave freedom from oppression and the earnings of the hands and the productions of the mind to all. This principle of personal liberty was more definitely expressed in the Constitution of 1852 in various articles and especially in the one forbidding slavery and limiting involuntary servitude to punishment of crime, which has since been repeated in the Constitutions of 1864, 1887 and 1894. There was no such provision in the Constitution of the United States until just after the Civil War, a system of slavery having been recognized by the laws up to that time. In 1865 the United States passed the Thirteenth Amendment to the Constitution which adopts substantially the provisions of the Hawaiian Constitutions on this point.

In considering the meaning and application of a law, much light is sometimes gained by studying the circumstances of the enactment of the law and the evils which were sought to be

remedied.   In the United States slavery had long been a very live issue between different portions of the country and became at last the cause of civil war, which war terminated in its destruction.   At the close of the war, Congress and those States which had stood by the government, impressed with the gravity of the ordeal through which the country had passed, and wishing to forever prevent any possibility of a return to a toleration of slavery or approximation thereto within the United States, enacted the Thirteenth Amendment to the Constitution.

There are many instances of involuntary servitude in the United States, which are admitted to be outside of the application of this amendment.   Among these are the involuntary service which minor children have to perform for their parents; the service which citizens have to perform at the order of the sheriff in the case of public disorder; the service which citizens are compelled to perform upon being drafted into the army; the service which enlisted soldiers and sailors have to perform after enlisting, circumstances having occurred which cause them to be unwilling to longer serve; the involuntary service of sailors who having freely signed the ship's articles in the merchants' service, afterwards, for reasons which may be good or bad, desire to be free from such service.

This law giving the Board of Health and its agents authority to require a reasonable amount of labor from the patients has existed for forty years, during all of which time these Islands have enjoyed the protection of the constitutional provisions forbidding involuntary servitude and no case has ever been brought into the courts complaining against such enactment, and I do not know that it has been complained of in public discussions, either in the press or in the legislature, though it may have been. But in any case, it has never attracted much attention.   I find in the regulations (Section 5, page 89), a provision that all ablebodied lepers are required to keep the surroundings of their houses clean, to whitewash the houses in which they live, which are not painted with oil paint, twice a year, for which lime

15—U. S. D.

and brushes are furnished. This is the only provision in the rules and regulations for work by the patients, and it may be that this is the construction by the Board of Health of the meaning and intent of the law, referred to, or it may be that, believing that they may require general labor other than that mentioned, yet that they have chosen not to require it. Work for one's self, even though it is involuntary, is not strictly "servitude" at all, and where it consists in light and rarely required attention to matters reasonably necessary to the comfort of the one required to perform it, it may well be doubted if it comes within the constitutional provision against involuntary servitude. If there should ever be a complaint against performing such labor as required under this section, and it should be found to be inconsistent with such constitutional provision, it could be declared unconstitutional without affecting the status of the rest of the statute on the subject of leprosy.

The opinion of the Justices of the Supreme Court under the Monarchy in response to questions submitted by the legislature of 1884 as to the constitutionality of the laws relating to the segregation of lepers, (5 Haw. 162), is of value in this discussion, although it would have greater weight had the opinion been given after argument on both sides of the question. The Justices, referring to the general acquiescence of the community in the law for a long period of time and to the principles of the application of the police power, express the opinion that the law in question is wholesome and constitutional.

The contention of the demurrer that the return does not state facts sufficient to warrant the detention by the said respondent of the said Mikala Kaipu, is not, I think, borne out by the allegation of the return that she has been examined in conformity with the regulations of the Board of Health and has been pronounced a leper by the proper medical authorities. Such finding by the examining physicians was a fact sufficient to justify the Board of Health in its action.

Upon these considerations, the demurrer and exceptions are overruled.