## THE ATCHISON STREET RAILWAY COMPANY v. THE MISSOURI PACIFIC RAILWAY COMPANY.

1. BILL OF RIGHTS, *Not a Mere Collection of Glittering Generalities.* The bill of rights is something more than a mere collection of glittering generalities: some of its sections are clear, precise and definite limitations on the powers of the legislature and all other officers and agencies of the state; and while others are largely in the nature of general affirmations of political truths, yet all are binding on legislatures and courts, and no act of the legislature can be upheld which conflicts with their provisions, or trenches upon the political truths which they affirm.

2. ———— Each section of the bill of rights is devoted to one subject, and all terms and phrases used therein must be considered as referring to and interpreted by such subject.

3. ———— Section 2 is devoted to matters of a political nature. It is an affirmation of the sovereignty of the people, and a declaration of the agency by which and the conditions under which political privileges and immunities may be granted.

4. ———— Said section does not inhibit the legislature from granting to municipal corporations the power to permit railway companies to construct and operate street railways therein.

5. STREET RAILWAYS; *Power of Cities.* Under the general control over the streets and alleys given to cities of the second class by chapter 19, Comp. Laws 1879, the city council had the power to grant to a street railway company permission to construct and operate a street railway on the streets of the city, and a track constructed by virtue of such permission was lawfully occupying the street.

6. PRELIMINARY INJUNCTION, *Refused; Order Not Reversed.* Where the district court refused a preliminary injunction, and from the record it is not clear that upon the hearing the court was put in full possession of all the facts necessary to a just determination of the rights of the parties, *held,* on review, that, though the trial court may have erred in some of its conclusions, the order will not be reversed, but the parties will be left to the final trial for an adjudication of their rights and duties, in accordance with the views expressed by this court.

7. ———— The provisions of § 7, chapter 23, Comp. Laws 1879, do not apply to a street railway company, incorporated for the purpose of constructing and operating a horse-car railway in the streets of a single city.

*Error from Atchison District Court.*

ACTION by *The Atchison Street Railway Company* against *The Missouri Pacific Railway Company.* The plaintiff prayed the court—

"To enjoin and restrain the defendant, its officers and agents, and all and every person acting by, through or under it, or its officers, from in any manner cutting the rails forming plaintiff's track, or in any manner interfering with or obstructing the crossing, taking up or removing plaintiff's track or any part thereof, or the rails or timber of said track or any part thereof, or causing the same to be done in any manner whatever; and that upon the final hearing hereof, such injunction may be made perpetual; and that the plaintiff recover its costs herein, and for all relief herein to which it may be entitled."

June 7, 1883, a temporary restraining order was made by the probate judge of Atchison county. At the June Term, 1883, of the district court, plaintiff's application for a temporary injunction was heard, and the court stated its conclusions of fact and of law, and thereon adjudged that the plaintiff is not entitled to a temporary injunction in the case, nor to any relief therein as prayed for in its petition. The plaintiff brings this order and judgment to this court for review.

*H. M. Jackson*, for plaintiff in error.

*Everest & Waggener*, for defendant in error.

The opinion of the court was delivered by

BREWER, J.: In October, 1880, the city council of Atchison by ordinance gave to J. H. Beeson & Co. their successors and assigns, the right to construct a street railway upon certain streets in the city of Atchison. In November, 1880, plaintiff in error was incorporated as a street railway company, and in the same month, by ordinance plaintiff was accepted as the successor of Beeson & Co., and as such given all the rights theretofore granted to said Beeson & Co. Among the streets named was Fifth street, and the right given was to lay a track and operate cars upon, but lengthwise, upon said Fifth street. In pursuance of this authority, the plaintiff constructed its track and operated its cars on said street. Subsequently the defendant was given the right to cross said street with its track. On June 7, 1883, defendant was about to cut the rails forming plaintiff's track and lay down common steam railroad rails, so that in the operation of plaintiff's cars they would necessarily drop into the space where its rails were cut and then rise over the rails about to be laid by defendant, and drop again on the opposite side. Defendant was about to put in three such tracks, so that each pair of wheels under each of plaintiff's cars would drop and rise again six times while crossing such space, within much less than the length of one lot. Thereupon the plaintiff sought to enjoin

the defendant from so cutting its rails and obstructing the same. A restraining order was granted by the probate judge of Atchison county. Afterward, and on due notice, the parties respectively appeared in the district court, and plaintiff's application for a temporary injunction was heard and denied. Plaintiff made and served a case-made for the supreme court, which contains the conclusions of fact and of law stated by the court, and also a part of the evidence offered on the trial.

Upon these facts several questions of importance and difficulty have been discussed by counsel. Plaintiff states three, which it claims are involved, as follows:

"(1.) Could the legislature confer upon the mayor and council of the city of Atchison the authority to pass the ordinances under which plaintiff laid its tracks? (2.) Was the right to lay down tracks and operate cars thereon, as given by such ordinance, the granting of a special privilege within the meaning of § 2 of bill of rights? (3.) Had the legislalature, before the passage of such ordinances, authorized the mayor and council to pass ordinances authorizing the laying down of tracks and the operating of street cars thereon?"

The first two questions may be considered together, and they present a matter of great moment. If the claim of defendant is sustained, it establishes a wide departure from the recognized method of procedure in other states; and it abridges largely the control over the streets and other internal affairs of the city, which elsewhere it has been settled the legislature may grant to municipal corporations. The inhibition of such legislation is based upon § 2, bill of rights, which is as follows:

"All political power is inherent in the people, and all free governments are founded upon their authority, and are instituted for their equal protection and benefit. No special privileges or immunities shall ever be granted by the legislature which may not be altered, revoked or repealed by the same body; and this power shall be exercised by no other tribunal or agency."

It is claimed by defendant that the inhibition is contained in the last clause, and the argument is that the right granted by the ordinances was a special privilege; that it was granted by the mayor and council of Atchison, which was another

tribunal or agency than the legislature, which alone could exercise that power under said § 2.

We have been unable to find a provision like this in the constitution or bill of rights of any other state. The nearest approach thereto is in the second section of the bill of rights of the constitution of 1851 of the state of Ohio, which reads as follows:

"All political power is inherent in the people. Government is instituted for their equal protection and benefit, and they have the right to alter, reform or abolish the same whenever they may deem it necessary; and no special privileges or immunities shall ever be granted that may not be altered, revoked, or repealed by the general assembly."

It will be remembered that the framers of our constitution expressly selected that constitution as a model. (Proceedings of Wyandotte Constitutional Convention, pp. 16 to 20.) And our bill of rights- is in many respects an exact copy of the one in that constitution. In this particular section some expressions, as will be seen, are copied *verbatim;* but an important and significant change is made by the addition of the last clause of the last sentence, and upon this clause hinges the present question. One contention of counsel for plaintiff is, that the bill of rights is not to be considered as containing precise limitations upon power, but rather only comprehensive statements of general truths; that it is more in the nature of a guide to the legislature, than a test for the courts. We quote from his brief:

"'Bills of Rights,' as is said in Sedgwick on Statutory and Constitutional Law, (pp. 179, 180,) 'must be regarded rather as guides for the political conscience of the legislature than as texts of judicial duty;' and further: 'The landmarks of the legislative and judicial authority are rather to be found in the division of power, contained in the constitution, among the three great branches of the government, and the specific limitation imposed by the instrument on the lawmaking branch, than in these general declarations of political truths.' Again, Judge Cooley has said of bills of rights: 'They are declared rather as guides to legislative judgment, than as marking an absolute limitation of power.' (Cooley's Const. Lim., p. 176.) 'A formal and public declar-

ation of popular rights and liberties.' (Bouvier's Law Dict.)
'And so little importance was given to the bill of rights in
the convention which framed the federal constitution, that
the original constitution contained none, and it was afterward
adopted as an amendment; though the question was presented
on September 12, 1787, and on the motion of Mr. Gerry for
a committee to prepare a bill of rights, which motion did not
prevail.' (Madison Papers, pp. 1565–6.)  The supreme court
of the state of Michigan, upon this subject, has said: 'Declar-
ations of rights, or bills of rights, are the enumeration of
certain great political truths essential to the existence of free
government.' (30 Mich. 201.)"

In short, counsel seems to look upon it as but little more
than a compilation of glittering generalities.  From this, as
broadly as it is stated, we dissent.  Many of its sections are
clear, precise and definite limitations upon the powers of the
legislature, and every other officer and agency of the people.
Section 5 reads: "The right of trial by jury shall be in-
violate."  Section 16: "No person shall be imprisoned for
debt except in cases of fraud."  The meaning and extent of
these are clear.  They limit the power of the legislature, and
no act of that body can be sustained which conflicts with
them.  Indeed, all of them may be considered, generally
speaking, as conditions and limitations upon legislative ac-
tion; and no law can be sustained which trenches upon the
rights guaranteed by them, or which conflicts with any lim-
itation expressed in them.  It is true many of them are
largely mere affirmations of political truths; and yet as to
those, it may safely be asserted that the political truths af-
firmed cannot be ignored in any valid enactment.  See upon
the general scope and effect of bills of rights, Story on the
Const., ch. 44; 2 Kent's Com., Lect. 24.

What then is the precise scope and meaning of § 2 of the
bill of rights?  It may be remarked certainly as to all the
other sections, that each refers to one particular subject;
some, it is true, containing several provisions, but all bear-
ing upon the one subject.  This fact is important in deter-
mining the scope of this section.  From the uniformity in
respect to the other sections, it may be justly concluded that

the same rule obtains in this: that one general subject-matter is treated of, and that all its language is to be interpreted as having reference to that single subject. So the question really is, not how broad and comprehensive might be the meaning of the last sentence, standing in a separate section, but what is its true intent and meaning when joined with the first sentence in a single section? Tested in this way, we think the words "no special privileges or immunities" refer to privileges or immunities of a political nature. The section obviously treats of political powers, privileges, and immunities. It commences: "All political power is inherent in the people." It thus affirms the sovereignty of the people, that all political power proceeds from them, and upon the exercise of that power they placed the limitations and restrictions contained in the other part of the section; so that the last sentence really means that no political privilege, no immunity from any political duty, any duty from the individual to the public, can be granted by the legislature which may not be altered or revoked by that body; and that no other tribunal or agency in the state shall have power to grant any such political privilege or freedom from political duty. These are such duties as those of serving in the militia, as jurors, filling offices, etc. A franchise involving solely matters of pecuniary interest or a privilege in respect to property, can in no just sense be called a political privilege. It touches no duty which the citizen as such owes to the state. Beyond the argument derived from the unity of subject manifest in the several sections of the bill of rights, and the joining of the two sentences in the one section, are these considerations tending to support the construction we have given: In the body of the constitution are found certain limitations on the action of the legislature in respect to property privileges and franchises, (art. 12, § 1; art. 13, §§ 1, 9,) the former treating of corporations, and the latter of banks. In each of these cases the right to amend or repeal is expressly reserved. This would be unnecessary if this section of the bill of rights has the extended application claimed.

Again, if the framers of our constitution had supposed or intended that this section should have the operation claimed for it in respect to property rights and interests, it would seem that it would have been the subject of much discussion and its language criticised and carefully weighed. But while some of the sections in the bill of rights provoked much discussion, this seems to have passed almost unnoticed. Why the addition of this clause was° made to the section, as it stood in the Ohio model, nothing in the proceedings of the convention advises; no reason was given by the committee which had the matter in charge, and no questions were asked. Obviously it attracted little attention.

And again, the state has existed under this constitution for nearly a quarter of a century; many questions and controversies have arisen as to the powers of a city council, a board of county commissioners, and other subordinate tribunals, and the sources as well as the limitations of such powers; but this is the first time within our knowledge that any such scope and operation has been claimed for this section, or its provisions. The silence of the profession in this direction is entitled to consideration. Surely the scope of this section, as now claimed, has not been obvious to the members of the bar.

We think therefore that, notwithstanding said § 2, the legislature has power to authorize municipal corporations to permit street railway companies to occupy the streets with their railroad tracks.

This brings us to the third question presented by counsel: Had the legislature given to the city of Atchison this power? It is conceded that no special grant of power in this direction had ever been made; but the contention is, that the general control of the streets vested in the corporation was sufficient to validate its action in granting permission to plaintiff to occupy the streets with its railway. This proposition we think must be sustained. The act in force was chapter 19, Comp. Laws of 1879. By it, (§§ 32 and 54,) the council was given power to open and improve the streets, avenues and alleys, and by § 55 it was given power to prevent en-

croachments, to remove obstructions, regulate the planting and protection of shade trees, the building of doorways, awnings, hitching posts and rails, "and all other structures projecting upon or over and adjoining, and all other excavations through and under the sidewalks, or along any streets of the city." Besides this, § 31 of said chapter vested the care, management and control of the city in the mayor and council, with power—

"To enact, ordain, modify or repeal any and all ordinances not repugnant to the constitution and laws of this state, and such as it shall deem expedient for the good government of the city, the preservation of the peace and good order, the suppression of vice and immorality, the benefit of trade and commerce, and the health of the inhabitants thereof, and such other ordinances, rules and regulations as may be necessary to carry such power into effect."

Now under this we think the council had power to permit a street railway company to construct and operate a railway upon the streets. Judge Dillon, in his work on Municipal Corporations, (§ 575,) thus sums up his conclusions derived from an examination of all the reported cases upon the subject of railways and streets:

"As respects ordinary railways operated by steam, and street railways operated by horses, legislative authority is necessary to warrant them to be placed in the streets or highways. The legislature may delegate to municipal or local bodies the right to grant or refuse such authority. The usual powers of a general nature in municipal corporations over streets are not sufficient to confer upon them the right to authorize the appropriation of streets by ordinary railroads, whose tracks are constructed in the usual manner and whose trains are propelled by steam. But it is otherwise as respects horse railways, and the ordinary powers of municipal corporations are usually ample enough, in the absence of express legislation on the subject, to authorize them to permit or refuse to permit the use of streets within their limits for such purposes."

See the long list of authorities cited by the author in a note to § 570.

In this direction we think the language of the supreme

court of Louisiana, in *Brown v. Duplessis*, 14 La. An. 842, is of great weight:

"No citizen has a legal right to complain that the streets are used by other citizens in a peculiar manner, even if it cause him a little inconvenience, so long as he himself is allowed the free use of the streets in his peculiar mode. The streets are destined for public use, but not for a particular mode of public use. If the city of New Orleans wished to expend the money necessary for the laying of rails throughout the city for the purpose of permitting all who wished to run their own cars thereupon, drawn by horses or mules, no one could complain, so long as it did not prevent other modes of traversing the streets; for traveling in cars on rails is one mode of using public streets, and there is no reason in the nature of things why it should be lawful to travel in a carriage or gig upon the streets, and not lawful to travel in a car upon rails fixed in the streets, but not so laid as to prevent the use of the streets by other modes of conveyance. If it does not suit the public coffers or the public convenience that the city should lay rails for the free use of the public, it follows from the premises that the city has the prerogative of selling the right-of-way, for a specified time, to one or more persons, who shall lay rails and have the privilege of running cars, drawn by horses or mules, according to a tariff fixed by the common council. This does not impede the ordinary mode of use; promotes trade; unites distant parts of the city; benefits the health of citizens by enabling them to live beyond the crowded thoroughfares; and is not an alienation or appropriation of a portion of the public streets to private uses."

It is unnecessary in this case to decide more than that the plaintiff was rightfully occupying the streets with its track. We need not affirm the validity of the ordinance in all respects. It is enough that it gave express permission to the plaintiff to occupy the street with its railway. Whether the council could, under the powers which it then possessed, grant an exclusive right to the plaintiff, whether it could give to the plaintiff a vested right for a series of years, whether it could bind the city by the attempted provision in respect to the purchase of the railway after the expiration of twenty years, are matters which are unnecessary for us to determine, and concerning which we therefore express no opinion.

All we decide is, that the city had the power and did give the plaintiff permission to occupy the streets with its railway track; that such railway track was therefore not an obstruction, and could not be disturbed wantonly by a stranger. The consent given to the defendant to lay its track through the streets of the city was not a revocation of the permit given to plaintiff; nor did it authorize the defendant to interfere unnecessarily with the existing track, or its use by the plaintiff.

We think, therefore, that the court erred in its conclusions, and that the right of defendant was not paramount to that of plaintiff. We do not think that it follows from this, however, that the order of the district court should be reversed. The order was made on an application for a preliminary injunction, and while it appears that the plaintiff offered evidence tending to prove and establish as a fact that by the use of a mechanical contrivance of moderate expense the crossing of the two tracks might be made without serious inconvenience to either, yet there was no finding of fact made by the court in respect to this matter; and perhaps the full testimony, which it is not pretended is preserved in the record, may have overthrown plaintiff's evidence in this respect. We think, therefore, that the case should stand for final hearing, and that at such hearing the court should make such order in regard to the crossing as will preserve to each party its right. We may not anticipate what the testimony will show. We think it may safely be affirmed that the defendant had a right to construct its track across that of plaintiff. In determining the manner of crossing, and the means that should be used to secure the most of safety with the least inconvenience to either party, the court will act upon full consideration of the testimony. Doubtless, the larger size, the greater weight, and the motive power of the cars drawn by steam will require more careful protection than is needed by the lighter horse cars, and a slight inconvenience in crossing must yield to the larger demands of safety. As to the expense of making such crossing, as it is for the benefit of de-

fendant, it should be obviously borne mainly, if not wholly, by it. As to how it should be made, we leave, as before said, to the determination of the trial court on the final hearing.

Another matter presented by counsel for defendant requires brief notice. It is claimed that the plaintiff was not a valid incorporation. Its charter is not set out in full, but obviously it was prepared under § 6, chapter 23, Comp. Laws of 1879, and contains all the matters required by such section. The only question thereon that can be raised is under the third subdivision, which requires the charter to state the place or places where the business of the corporation is to be transacted. The charter names the streets in the city of Atchison, and adds these words:

"And also in such other places near to and adjoining said city of Atchison, and connected with such street railway in said city, as may be authorized or permitted in said county of Atchison, and across the bridge near the Missouri river, at said city of Atchison, and also in the county of Buchanan."

Whatever of indefiniteness there may be in these words, and whether the plaintiff would have authority to construct its railway outside the limits of the city of Atchison, need not be determined. The only question is, whether it was incorporated with power to construct and operate a railway in the city of Atchison. A corporation may be legally incorporated and yet not have all the powers which its projectors intend it should acquire and possess. We do not think that § 7, ch. 23, Comp. Laws of 1879, applies to the incorporation of companies for the construction of street railways in the streets of a single city. It seems rather to refer to steam railroad companies, turnpike and plank-road companies — roads which are intended to connect cities and towns — for it provides that the charter shall state the places from and to which the road is intended to be run, the counties through which it is intended to be run, and the estimated length of the road.

We think, therefore, that for the purposes of this case the corporation must be considered as legally created. These are

all the matters requiring notice; and for the reasons heretofore stated, the order will be affirmed.

All the Justices concurring.