IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 125,156

STATE OF KANSAS,
*Appellee*,

v.

JASON M. GLEASON SR.,
*Appellant*.

SYLLABUS BY THE COURT

1.

To determine prosecutorial error, an appellate court decides whether the act complained of falls outside the wide latitude afforded to prosecutors to conduct the State's case in a way that does not offend the defendant's constitutional right to a fair trial. To determine whether a particular statement falls outside the wide latitude given to prosecutors, the reviewing court considers the context in which the statement was made, rather than analyzing the statement in isolation.

2.

Section 5 of the Kansas Constitution Bill of Rights preserves the jury trial right as it historically existed at common law when our state's Constitution came into existence in 1859.

3.

Section 5 cements in our Constitution all the jury rights that existed at common law in Kansas at the time the Constitution was adopted. They are guaranteed "inviolate." Thus, any erosion of those rights, whether by legislative action or judicial decision runs afoul of the jury trial protections found in section 5.

1

4.

At the time the Kansas Constitution was ratified in 1859, errors striking at the core function of the jury—that is, errors recognized by the common law at ratification—did not require automatic reversal. Instead, the "inviolate" right included only a right to a presumption of prejudice on appeal; not a right to automatic reversal.

5.

The cumulative error rule does not apply if there are no errors or only a single error.

Review of the judgment of the Court of Appeals in an unpublished opinion filed February 2, 2024. Appeal from Reno District Court; TRISH ROSE, judge. Oral argument held October 30, 2024. Opinion filed July 3, 2025. Judgment of the Court of Appeals reversing the district court is reversed. Judgment of the district court is affirmed.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office argued the cause and was on the briefs for appellant.

*Andrew R. Davidson*, deputy district attorney, argued the cause, and *Thomas Stanton*, district attorney, and *Kris W. Kobach*, attorney general, were with him on the briefs for appellee.

PER CURIAM:  A jury convicted Jason M. Gleason Sr. of a single count of battery of a state correctional officer. A Court of Appeals panel reversed Gleason's conviction and remanded his case for a new trial due to prosecutorial error, cumulative error, and error in omitting an element in the jury instruction on battery. We granted the State's petition for review. We also granted Gleason's conditional cross-petition for review of the panel's decision to apply a harmless error analysis to the jury instruction issue.

For the reasons discussed below, we reverse the panel's decision. Viewed in context, all but one of the prosecutor's comments do not constitute error because they fell within the wide latitude afforded to prosecutors to craft arguments and form reasonable inferences. We also find the single instance of prosecutorial error to be harmless. Further, we are not persuaded by the arguments Gleason raises in his conditional cross-petition for review. An instructional error that omits an element of a criminal offense is reviewed under section 5 of the Kansas Constitution Bill of Rights using a presumed prejudice standard. The State may rebut that presumption if it shows the defendant was not prejudiced by the omission. The State has done so here. Finally, Gleason is not entitled to relief under the doctrine of cumulative error because the doctrine does not apply if there is only a single error.

FACTUAL AND PROCEDURAL BACKGROUND

On August 27, 2019, Hutchinson Correctional Facility Officers Austin Spencer and Edwin Towers were on duty monitoring the dining hall during lunch. Gleason, an inmate at the facility, approached the officers with his fists clenched by his sides and swung a punch at Spencer, who was not looking in Gleason's direction. Spencer ducked and raised his left arm to block the attack.

Gleason ran away and pushed a table toward the officers while they attempted to subdue him. Towers eventually grabbed Gleason around his waist and wrestled him to the ground. Spencer tried to tackle Gleason and, in the process, flew over him and collided headfirst into a stool attached to a dining hall table.

Spencer sustained multiple injuries, including a cut on his nose and a dent on his forehead. As a result of his collision with the table, Spencer was diagnosed with a traumatic brain injury that required the insertion of multiple plates and screws into his

head and face. The nature of Spencer's head injury left him with long and short-term memory issues; consequently, he did not remember Gleason's attack.

The State originally charged Gleason with three counts of battery against a state corrections officer, alleging that he "knowingly cause[d] physical contact in a rude, insulting or angry manner" to Spencer, Towers, and a third correctional officer. See K.S.A. 21-5413(a)(2), (c)(3)(A). The State later dismissed two of the charges due to witness unavailability, and the case proceeded to trial solely on the charge involving Spencer.

At trial, the State presented the evidence outlined above, which included a video that captured the incident. The video provides a view of the dining hall from various angles but does not definitively show that Gleason's punch landed. Several correctional officers, including Spencer, testified. None could conclusively state that Gleason's swing contacted Spencer. Gleason's theory of defense at trial was that he never made contact with Spencer; at most, he argued, he was guilty of attempted battery. Consistent with Gleason's defense, the district court instructed the jury on the lesser included offense of attempted battery of a state correctional officer.

The jury convicted Gleason of a completed battery against a state corrections officer. The district court sentenced him to a 130-month term of imprisonment, consecutive to the prison term he was already serving.

Gleason appealed his conviction, alleging several trial errors warranted reversal of his conviction. Gleason claimed the evidence was insufficient to support his conviction and also alleged jury instruction error, prosecutorial error, and cumulative error. A Court of Appeals panel found the evidence was sufficient to support Gleason's conviction and, although the jury instruction setting forth the elements of a criminal offense was legally erroneous, the error ultimately was harmless. But the panel concluded reversal of

Gleason's conviction was warranted due to prosecutorial error during opening and closing arguments, both on its own and based on cumulative error when considered alongside the erroneous jury instruction. See *State v. Gleason*, No. 125,156, 2024 WL 392001 (Kan. App. 2024) (unpublished opinion).

We granted the State's petition for review. We also granted review of Gleason's conditional cross-petition for review challenging the panel's decision to apply a harmless error analysis to the jury instruction issue.

Jurisdiction is proper. See K.S.A. 20-3018(b) (providing for petitions for review of Court of Appeals decisions); K.S.A. 60-2101(b) (The Supreme Court has jurisdiction to review Court of Appeals decisions.).

ANALYSIS

On review, the State challenges the panel's decision to reverse Gleason's conviction based on prosecutorial and cumulative error. In his conditional cross-petition for review, Gleason argues the panel erred by applying a harmless error analysis to the instructional error omitting an element of the battery charge. He claims this error infringes on his federal and state constitutional rights to a jury trial and argues for reversal under section 5 of the Kansas Constitution Bill of Rights. We address these issues in the following order:  (1) prosecutorial error, (2) instructional error, and (3) cumulative error.

*Prosecutorial error*

The State contends that the panel wrongly determined prosecutorial error during opening and closing arguments warranted reversal of Gleason's conviction.

5

Appellate courts review claims of prosecutorial error using a two-step process to assess whether error occurred and, if so, whether the defendant suffered prejudice as a result. *State v. Sieg*, 315 Kan. 526, 535, 509 P.3d 535 (2022). First, we determine whether error occurred. A prosecutor commits error if the act complained of fell outside the wide latitude afforded the prosecutor in conducting the State's case in a way that does not offend the defendant's constitutional right to a fair trial. *State v. Thomas*, 311 Kan. 905, 910, 468 P.3d 323 (2020). Second, if we find error, we must determine whether the error prejudiced the defendant's due process rights to a fair trial, asking whether the State has shown beyond a reasonable doubt that the error did not affect the outcome of the trial in light of the whole record, i.e., there is no reasonable possibility that the error contributed to the verdict. *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

Battery occurs by two distinct types of conduct:  (1) knowingly or recklessly causing bodily harm to another person, or (2) knowingly causing physical contact with another person when done in a rude, insulting, or angry manner. K.S.A. 21-5413(a)(1)-(2). These same provisions apply when the victim is a state correctional officer. K.S.A. 21-5413(c)(3)(A)-(B). The State charged Gleason for the second type of battery against a state correctional officer in violation of K.S.A. 2019 Supp. 21-5413(a)(2), (c)(3)(A), alleging that he "knowingly cause[d] physical contact in a rude, insulting or angry manner" to Officer Spencer.

On appeal, the panel found certain statements made by the prosecutor during the State's opening and closing remarks impermissibly focused the jury's attention on the injuries Spencer sustained after colliding with the table, which suggested the jury could convict Gleason of battery based on bodily harm rather than physical contact. The panel first found fault with the following italicized portion of the prosecutor's opening statement:

"This afternoon you're going to hear from several witnesses and what the State expects the evidence to show is that on August 27th, 2019, while Mr. Gleason was in the custody of the secretary of corrections he knowingly caused physical contact in a rude angry and insulting manner with Austin Spencer, who was a corrections officer in the performance of his official duty during that time. What you will see and hear from the witnesses is during lunch in the chow hall in the Hutchinson Correctional Facility Mr. Gleason finished eating. He put his tray away. He marched up to Austin Spencer, who was standing with another corrections officer, Edwin Towers. While talking with Edwin Towers, Mr. Gleason swung at Mr. Spencer striking him and then taking off running through the chow hall as officers attempted to gather Mr. Gleason up because of what he had just done. There will be a couple other officers who responded who helped take Mr. Gleason into custody at that time, but you will hear from officers who were directly involved. You will hear from some officers that investigate the incident and there's surveillance video that shows what happened. *Austin Spencer, when he was trying to take Mr. Gleason to the ground, collided with a metal table in the chow hall which caused great damage to his forehead, and you will hear the injuries he sustained from that, and at the conclusion of this case the State will ask you to find Mr. Gleason guilty of battery on a state's corrections officer with regard to Austin Spencer. Thank you.*" (Emphasis added.)

The panel also took issue with the State's rebuttal closing argument:

"The injuries were the proximate cause of Jason Gleason's actions. He is the one who you watched swing at Austin Spencer. They go around the table because he won't listen to what their commands are. Mr. Gleason did attack Austin Spencer. You can watch it. It happened. You have to determine whether or not he caused physical contact with Austin Spencer. The State would leave you with this one statement that when Austin Spencer received this injury, did you hear Edwin Towers talk about how it looked like a perfect impression of the seat he collided with in his head it made a dent line in his head. If you look at that and put his head right there, that's where that injury came from. This one is on the bridge of the nose where his glasses were. That injury happened probably when he got struck by Mr. Gleason. None of Austin Spencer's injuries would have happened had Jason Gleason not attacked him. It sounds like they're not arguing Jason

Gleason is innocent, that he did attack him. Mr. Bravi said he attempted to strike Mr. Spencer. Mr. Gleason is guilty of aggravated battery of Officer Spencer. And you can take this video back and watch it from each one of the angles of that camera. You'll be able to watch it. Up here in the top corner you will be able to see his approach in the other corner. Ladies and Gentlemen, that's battery of a law enforcement or state corrections officer. Thank you."

The panel held the prosecutor's comments amounted to a misstatement of the law because they improperly focused the jury's attention on the bodily harm Spencer sustained after colliding with the table and "essentially informed the jury that it could look to the evidence concerning Spencer's head injuries to find that Gleason perpetrated unlawful physical contact against Spencer and encouraged them to do the same." *Gleason*, 2024 WL 392001, at *7. The panel found the prosecutor failed in his duty to aid the jury in understanding how it should apply the law to the facts of the case and "paved the way for the jury to impermissibly convict [Gleason] of battery based on bodily harm, rather than physical contact." 2024 WL 392001, at *7.

Noting the evidence against Gleason was not overwhelming, the panel concluded that the prosecutor's erroneous comments constituted reversible error because they prejudiced Gleason's right to a fair trial: "[G]iven the repetitive nature of the prosecutor's statements and the use of the evidence he advocated for, one cannot definitively say whether the jury concluded Gleason was guilty under the theory of physical contact or bodily harm." The panel found the prosecutor's misstatement of the crime as "aggravated battery" harmless, however, because "[t]he jury was only instructed on battery of a state corrections officer and a corresponding instruction for merely attempting to commit the same offense. Thus, the jury was never placed in a position to afford the prosecutor's misstatement any weight." *Gleason*, 2024 WL 392001, at *11.

Prosecutors have wide latitude in crafting their arguments and drawing reasonable inferences from the evidence. Even so, "[a]ny argument 'must accurately reflect the

evidence, accurately state the law, and cannot be "intended to inflame the passions or prejudices of the jury or to divert the jury from its duty to decide the case based on the evidence and the controlling law."'" *State v. Longoria*, 301 Kan. 489, 524, 343 P.3d 1128 (2015); see *State v. Davis*, 306 Kan. 400, 413-14, 394 P.3d 817 (2017) ("A prosecutor 'cross[es] the line by misstating the law,'" and "'a prosecutor's arguments must remain consistent with the evidence.'"); *State v. Carter*, 305 Kan. 139, 151, 380 P.3d 189 (2016) (A defendant is denied a fair trial when a prosecutor misstates the law and the facts are such that the jury could have been confused or misled by the statement.). To determine whether a particular statement falls outside the wide latitude given to prosecutors, we consider the context in which the statement was made, rather than analyzing the statement in isolation. *State v. Becker*, 311 Kan. 176, 182, 459 P.3d 173 (2020).

In isolation, the prosecutor's comments could appear problematic. But a full review of the record, including opening and closing remarks made by both parties, provides necessary context. The prosecutor began his opening argument by stating he expected the evidence to show that Gleason "knowingly caused physical contact in a rude angry and insulting manner with Austin Spencer." Next, the prosecutor explained Gleason punched Spencer and then told the jury it would see a video of the incident and hear from the officers who were either directly involved or had investigated the incident. The prosecutor told the jury that Spencer was injured when he tried to help restrain Gleason and that it would hear about Spencer's head injuries. Finally, the prosecutor stated, "[A]t the conclusion of this case the State will ask you to find Mr. Gleason guilty of battery on a state's corrections officer with regard to Austin Spencer."

Defense counsel used his opening statement to set forth the defense's theory of the case. Counsel believed the video evidence and witness testimony would show Gleason only *attempted* to hit Spencer and specifically argued Gleason did not directly cause Spencer's injuries:

"While those injuries to Mr. Spencer were bad, they weren't directly caused by Mr. Gleason. Mr. Gleason never actually punched Mr. Spencer in the face. He wasn't able to make contact with him. . . . Ladies and Gentlemen, I'm going to ask each and every one of you to hold the State accountable to its duty to prove each and every one of the elements to the charge. It's not whether Mr. Spencer got hurt. It's whether Mr. Gleason was a direct result of that. We're going to ask each of you to find Mr. Gleason not guilty of battery of a corrections officer."

During its case-in-chief, the State introduced the evidence outlined above. This evidence included witness testimony about and photographic evidence of Spencer's injuries:  the cut on his nose and his head injury that resulted in significant memory loss. Spencer testified that he did not remember Gleason's attack and did not remember writing a narrative report about the incident.

When cross-examining the State's witnesses, defense counsel asked questions about Spencer's injuries and memory issues. Counsel asked one witness if Spencer's injuries were "from hitting his head on the table and not from almost getting punched." Counsel also introduced into evidence photographs of screen shots from the video that showed the officers attempting to restrain Gleason, Spencer grabbing Gleason from behind, and Spencer sailing over Gleason and Towers.

In the State's initial closing argument, the prosecutor discussed the video and photographic evidence supporting the State's version of events. The prosecutor did not mention Spencer's head injury, only discussing the injury to Spencer's nose:

"You will get to see Mr. Gleason approach those two gentlemen, who were just doing their jobs, with a closed fist and take a swing at one of the officers. . . . As you can see Mr. Gleason is approaching those two officers and you can see the condition of his fists right there, and he goes after Austin Spencer. State's contention is he made physical

10

contact with Austin Spencer and when he did that he knocked his glasses off. He sustained injuries that you will be able to look at through these photographs; on the bridge of his nose."

Next, the prosecutor discussed the elements of battery the State was required to prove, focusing on the disputed element of knowing physical contact:

"What you have to do is look at the claims the State is making in Count I; Jason Gleason knowingly caused physical contact with Austin Spencer. He walked up to him and took a swing at him. Even if just a glancing blow it's physical contact. . . . If you watch the video you see him approach with his fist balled up, and he takes a swing at Austin Spencer, and the first thing he tries to do is run away. You've got your state of mind right there. The knowingly causing physical contact. If he brushes up against Austin Spencer, in that instance, that's physical."

Finally, the prosecutor discussed the elements of attempted battery, arguing that by swinging at Spencer, Gleason at the very least performed an overt act toward the commission of battery:

"The overt act must extend beyond mere preparation. It did. If you watch the video you can watch the whole thing happen, and that he did a direct movement towards the preparation of the completed offense. He put his tray—he put his tray up here. He marched this way, came back and swung at Austin Spencer. Ladies and Gentlemen, it's the State's contention that the evidence supports a conviction of battery of a law enforcement officer and we would ask that you find him guilty."

Defense counsel focused his closing argument on the theory that Gleason never made physical contact with Spencer; he only attempted to. Thus, counsel challenged as speculative the State's argument that Gleason's punch caused the cut on Spencer's face:

11

"[T]here's no evidence before you that [the cut on Spencer's face] was caused by glasses being pushed into somebody's face, or it's just as likely, if not more likely, that when he—when Officer Spencer was trying to tackle Mr. Gleason that—and he missed. That he hit his head on the table. That that evidence—that that injury occurred from there. What's important for you to consider is the jury is that Mr. Gleason in this case, his back was turned towards Officer Spencer when this occurred. Mr. Gleason had no way of knowing that, that Officer Spencer was behind him. You watched the video. You can see in the still pictures that Officer Spencer flew over Mr. Gleason in part because Officer Towers was pulling Mr. Gleason to the ground."

Defense counsel then discussed the State's burden to prove each element of the criminal offense beyond a reasonable doubt. Counsel stated:

"If every element that the State has put in front of you, they have to prove it. If one single element is missing, one single ingredient is missing, then you have the duty and obligation to find Mr. Gleason not guilty of that specific offense. I think that most people can agree that it's terrible that Mr. Spencer had head injuries from this, this altercation, but the injuries that occurred to his head was not directly caused by Mr. Gleason in this case."

Before asking the jury to acquit Gleason of battery, defense counsel argued that Gleason was not guilty because none of the officers testified that Gleason made physical contact with Spencer:

"There simply is no evidence that is before this Court and before you that shows that Mr. Gleason made physical contact with Austin Spencer. Even when Austin Spencer was trying to tackle Mr. Gleason, it appeared he flew over Mr. Gleason and he missed contact and Mr. Gleason didn't have any knowledge that Austin Spencer was behind him."

In rebuttal, the prosecutor made the complained-of statements referenced above. He reminded the jury of its obligation to determine whether Gleason caused physical

contact with Spencer, discussed both Spencer's head injury and the injury to his nose, and argued that none of the injuries would have happened absent Gleason's attack.

Having reviewed the challenged statements in context, we are not convinced the prosecutor's comments impermissibly suggested to the jury that it could convict Gleason of battery by physical contact based on evidence that Spencer sustained injuries when he collided with the table. Instead, as we explain below, the prosecutor's comments were consistent with the purpose of opening and closing arguments. See *State v. Chandler*, 307 Kan. 657, 685, 414 P.3d 713 (2018) (The purpose of the opening statement is to "'assist the jury in understanding what each side expects its evidence to establish and to advise the jury what questions will be presented for its decision.'") (quoting *State v. Love*, 305 Kan. 716, 728, 387 P.3d 820 [2017]); *State v. Pribble*, 304 Kan. 824, 832, 375 P.3d 966 (2016) (The fundamental purpose of a prosecutor's closing argument is to attempt to link the evidence presented to the elements that the State must prove to support a conviction.).

The prosecutor's opening remarks advised the jury of the elements of battery of a correctional officer and noted the evidence it would present to the jury to prove those elements, including witness testimony and a surveillance video. The prosecutor also explained the jury would hear about Spencer's head injuries resulting from his collision with a table. Contrary to the panel's assertion that the prosecutor's comments improperly focused the jury's attention on Spencer's head injuries, the comments simply referred to additional evidence that would be introduced. Because the State alleged Spencer was the victim of Gleason's battery, informing the jury about Spencer's head injuries was necessary to contextualize Spencer's inability to give meaningful testimony about the incident. Indeed, Spencer later testified about his injuries and the resulting brain trauma that prevented him from remembering anything about Gleason's attack.

During the State's initial closing argument, the prosecutor again discussed the elements the State was required to prove to establish Gleason's guilt for battery of a

13

correctional officer. In discussing these elements, the prosecutor did not mention Spencer's head injuries. Instead, the prosecutor attempted to link the cut on Spencer's nose to Gleason making physical contact when he swung at Spencer. Throughout this portion of the State's closing argument, the prosecutor's focus remained on the physical contact element with no discussion of Spencer's head injuries.

Although the prosecutor did discuss Spencer's head injuries during rebuttal, it appears these comments were made in response to defense counsel's assertion during closing argument that Gleason did not directly cause Spencer's injuries. Defense counsel suggested the cut on Spencer's nose was likely caused when Spencer hit his head on the table and pointed out that Gleason's back was to Spencer when that injury occurred. Counsel also claimed no evidence showed that Gleason made physical contact with Spencer; he said that even when Spencer tried to tackle Gleason, they "missed contact."

In considering whether a prosecutor's remark is within the wide latitude allowed a prosecutor during his or her argument, this court may consider whether the prosecutor's remark is provoked or made in response to defense counsel's remarks. *State v. Peppers*, 294 Kan. 377, 397, 276 P.3d 148 (2012); *State v. Miller*, 293 Kan. 535, 551, 264 P.3d 461 (2011). In response to defense counsel's argument, the prosecutor did assert that Gleason's actions caused Spencer's injuries—a reasonable inference from the evidence. See *Longoria*, 301 Kan. at 524 (Prosecutors have wide latitude in drawing reasonable inferences from the evidence.); *State v. Naputi*, 293 Kan. 55, 64, 260 P.3d 86 (2011) (The State's response to defense arguments was within the wide latitude given to prosecutors.). When discussing Spencer's head injuries, however, the prosecutor did not directly argue that these injuries were evidence that Gleason made physical contact with Spencer. The prosecutor told the jury it had to determine "whether or not [Gleason] caused physical contact with Austin Spencer." The prosecutor also distinguished Spencer's head injury from the injury to his nose and said the latter injury probably happened when Gleason struck him.

"A prosecutor is given wide latitude in the language and the manner of presentation of closing argument as long as the argument is consistent with the evidence." *State v. Hall*, 292 Kan. 841, Syl. ¶ 4, 257 P.3d 272 (2011). Throughout the State's closing argument, the prosecutor argued Gleason made physical contact with Spencer. The prosecutor also discussed Spencer's head injuries. But contrary to the panel's decision, the prosecutor never suggested to the jury that it could use the evidence of Spencer's head injuries to find that Gleason made physical contact with Spencer. Viewed in context, the prosecutor's statements, except for the conceded error misstating the crime of offense as aggravated battery, were not erroneous but instead fell within the wide latitude afforded to prosecutors to craft arguments and form reasonable inferences. See *Sherman*, 305 Kan. at 109.

Because we have identified one error, we move on to the second step of prosecutorial error analysis and find no reasonable possibility that the error contributed to the verdict. *Sherman*, 305 Kan. at 109. Here, we agree with the panel's analysis that the prosecutor's mischaracterization of the crime as aggravated battery was harmless. Because the jury was never instructed on any form of aggravated battery, jurors were never placed in a position to afford the prosecutor's misstatement any weight. Therefore, we find beyond a reasonable doubt that the error did not affect the outcome of the trial.

*Instructional error*

Next, we turn to the issue Gleason raises in his conditional cross-petition for review challenging the panel's holding that a jury instruction which omits an essential element of a criminal offense can be reviewed for harmless error.

As previously noted, the State charged Gleason with battery based on knowingly making physical contact with a state corrections officer in a "rude, insulting or angry

manner" under K.S.A. 2019 Supp. 21-5413(a)(2), (c)(3)(A). But the final jury instruction omitted the modifying phrase "rude, insulting, or angry manner" to describe how the physical contact must have occurred:

> "1.  Jason Gleason knowingly caused physical contact with Austin Spencer.
> "2.  Jason Gleason was in the custody of the secretary of corrections.
> "3.  Austin Spencer was a state correctional officer.
> "4.  Austin Spencer was engaged in the performance of his duty.
> "5.  This act occurred on or about the 27th day of August 2019, in Reno County, Kansas.
>
> "The state must prove that the defendant committed the crime knowingly.
>
> "A defendant acts knowingly when the defendant is aware that his conduct was reasonably certain to cause the result complained about by the state."

There is no dispute that the battery instruction, which omitted the required statutory phrase "rude, insulting or angry" describing the means by which unlawful physical contact must have occurred, should have been given. In most criminal appeals, we review instructional error claims using our well-established rubric outlined in *Plummer*:

> "[F]or instruction issues, the progression of analysis and corresponding standards of review on appeal are:  (1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in [*State v.*] *Ward* [, 292 Kan. 541, 565, 256 P.3d 801 (2011)]." *State v. Milo*, 315 Kan. 434, 438, 510 P.3d 1 (2022) (quoting *State v. Plummer*, 295 Kan. 156, 163, 283 P.3d 202 [2012]).

16

When a defendant fails to object to an instruction at trial, there is a failure of preservation under *Plummer*'s first prong, and we will reverse only for clear error. "Under the clear-error standard, the defendant has the burden to firmly convince us that the jury would have reached a different verdict if the instructional error had not occurred." *State v. Martinez*, 317 Kan. 151, 162, 527 P.3d 531 (2023). Because Gleason failed to object to the instruction at trial, one would expect our analysis to follow *Plummer*'s path and examine for clear error. Here, however, Gleason makes an argument rarely seen. He claims the omission of "rude, insulting, or angry manner" infringes a criminal defendant's right to a jury trial under section 5 of the Kansas Constitution Bill of Rights, which he contends offers greater protection to defendants than provided by either the *Plummer* framework or by the Sixth Amendment. Gleason suggests that section 5's use of the term "inviolate" renders any instructional error automatically reversible—and thus not subject to either our clear error rules or, indeed, to any species of the harmlessness test. It is axiomatic, of course, that if the constitutional guarantees of section 5 would afford Gleason relief where other tests—whether found in statute or in this court's caselaw—would not, the constitutional standard must triumph.

So, framing his argument this way, Gleason argues section 5 should be construed as precluding any reversible error analysis when the right to a jury trial has been infringed. In support, he relies primarily on a Mississippi Supreme Court decision, *Harrell v. State*, 134 So. 3d 266, 275 (Miss. 2014). *Harrell* held, based on nearly identical constitutional language, that it is always reversible error to deny an accused the right to have a jury decide guilt as to each element of a criminal offense.

To be clear, when undertaking review of Gleason's section 5 challenge, we are operating outside the bounds of our ordinary multi-step process of review under *Plummer* and related statutes. Thus, we must focus on the language and meaning of section 5 itself,

17

and in particular on the term "inviolate." We exercise unlimited review over constitutional challenges, including questions of state constitutional interpretation. *State v. Carr*, 314 Kan. 615, 646, 502 P.3d 546 (2022).

Section 5 of the Kansas Constitution Bill of Rights, which declares, "The right of trial by jury shall be inviolate," preserves the jury trial right as it historically existed at common law when our state's Constitution came into existence in 1859. Our caselaw since that time reflects this understanding of the right. In 1883, we declared that section 5's guarantee absolutely "preserves" the jury trial right as it existed prior to the adoption of the Constitution. Being "inviolate" was understood to mean that this right could not be "disturbed or limited." *In re Rolfs*, 30 Kan. 758, 761-62, 1 P. 523 (1883). In 1866 we explained that section 5 preserves the jury trial right as it historically existed at common law when our state's Constitution came into existence—an interpretive understanding that is still consistently cited in our opinions over 150 years later. *Kimball and others v. Connor, Starks and others,* 3 Kan. 414, 432, 1866 WL 430 (1866); *State, ex rel. v. City of Topeka,* 36 Kan. 76, 85-86, 12 P. 310 (1886) (Section 5 means "the right of trial by jury shall be and remain as ample and complete as it was at the time when the constitution was adopted."); *State v. Carr*, 314 Kan. 615, 647, 502 P.3d 546 (2022) ("This court has consistently held that section 5 '"preserves the jury trial right as it historically existed at common law when our state's constitution came into existence"' in 1859. [Citations omitted.]").

We have addressed the specific and purposeful usage of the word "inviolate" by the drafters—noting that the term ensures the jury right remains undisturbed. In 1948, we held that section 5 rights exist for the "benefit of the accused" and, because they are "inviolate," no one may take away those rights against the accused's will. *State v. Christensen*, 166 Kan. 152, 156, 199 P.2d 475 (1948). This language is an "uncompromising" limit on the power of the Legislature or the judiciary to alter the substance of the right to a jury trial. See *In re L.M.*, 286 Kan. 460, 476, 186 P.3d 164

(2008) (Luckert, J., concurring). See also *Hilburn v. Enerpipe Ltd.*, 309 Kan. 1127, 1135-36, 442 P.3d 509 (2019); *Atchison Street Rly. Co. v. Mo. Pac. Rly. Co.,* 31 Kan. 660, 665, 3 P. 284 (1884). The specific use of the term "inviolate" means that "'what may have been a mere common-law right to jury trial on the day before ratification of Section 5 was no longer a mere common-law right from ratification onward.'" *Hilburn*, 309 Kan. at 1136 (quoting *Miller v. Johnson*, 295 Kan. 636, 705, 289 P.3d 1098 [2012] [Beier, J., concurring in part and dissenting in part]). This language was used to elevate the right to a jury trial to be beyond everyday legislative and judicial modification which could impair the substance of that right. See *Hilburn*, 309 Kan. at 1136.

In sum, section 5 cements in our Constitution all the jury rights that existed at common law in Kansas at the time the Constitution was adopted. They are guaranteed "inviolate." Thus, any erosion of those rights, whether by legislative action or judicial decision runs afoul of the jury trial protections found in section 5.

What does all this mean for this case? To answer this question, it is useful to simply ask: would a defendant have won relief under the common law in 1859 under identical circumstances? If the answer is yes, section 5 mandates the same result today. If the answer is no, the section 5 right has not been violated. Therefore, to determine whether a trial error somewhere in the jury process violates the jury trial right preserved in section 5 we must know how the common law at ratification would have treated those errors. And a significant and substantive component of that common law was its appellate standard of review. In other words, the common law jury trial right preserved by section 5 included certain principles of appellate review, which must also be preserved "inviolate." Moreover, many—if not most—common errors affecting jury trials today were not errors at all under the common law at ratification. This is because they find their source in modern statutory guarantees or subsequent common law and caselaw development after the ratification of section 5.

Thus, when reviewing a section 5 claim such as Gleason's, it is imperative that courts focus the inquiry on a frozen moment in time at the ratification of the Kansas Constitution. We must first ask, was the conduct complained of a recognized error at common law at that time? And if the answer is yes, we must then assess the mode of review on appeal demanded by that same common law. So here, was the omission of an essential element from the jury instructions an error at common law in 1859? We discern that it was. And then, how were such errors reviewed on appeal at the same time? These are the questions to which we now turn.

Caselaw from our founding era indicates that omission of an essential instructional element was an error at common law. See *Horne v. State*, 1 Kan. 42, 72, 1862 WL 399 (1862) ("To make out the guilt of a person charged with crime, the prosecution must prove every material allegation and every ingredient of the crime."); see also *State v. White*, 14 Kan. 538, 541, 1875 WL 1390 (1875) ("We are not advised as to the instructions given by the court other than upon this matter of drunkenness. We must therefore assume that they were correct, and sufficient; that they stated the elements of the crime, and the necessity of proof as to the existence of each element, and the kind of evidence applicable to each element."). And a conviction could be vacated for omission of an essential element. See *State v. Whitby*, 15 Kan. 402, 403-04, 1875 WL 829 (1875). In *Whitby*, the defendant was convicted of first-degree burglary, but the information failed to charge entry. We held that it was "well settled that to constitute burglary there must be both a breaking and an entry. Our statute makes no change in the law in that respect," and reversed the judgment. 15 Kan. at 403-04.

But our common law did not require automatic reversal even for errors that struck at the core function of the jury. In *Madden v. State of Kansas*, 1 Kan. 340, 354, 1863 WL 298 (1863), our predecessors reversed for "irregularity" on the part of the jury when it

20

was not kept together and jury members conversed with members of the public during deliberations. But prior to reversal, the court tasked the State to establish that the error was not prejudicial.

> "It is of the utmost importance that triers, who pass upon the lives and liberties of men, should so act that no possible suspicion can attach to them of having been in a position where improper influences, prejudicial to the accused, or in his favor, may have operated on their minds. Where the opportunity for such influences is afforded, if the verdict is against the accused, he is entitled to the presumption that the irregularity has been prejudicial to him, and it is incumbent on the state to show that no such injury could have occurred by reason of the irregularity." 1 Kan. at 354.

We also permitted the State to rebut the presumption of prejudice when confronted with an error in *Morton v. State of Kansas*, 1 Kan. 468, 1863 WL 314 (1863), concerning jury selection.

> "Had the defendant chosen to rely upon this error of the court, the judgment must, we think, have been set aside, but the record shows that he then challenged the same jurors peremptorily and thus removed them from the panel. By this means he seems effectually to have relieved himself from the grievance of which he complains, and the case would seem to be brought within the provision of section two hundred and seventy-six of the code of criminal procedure, which directs that 'on an appeal the court must give judgment without regard to technical errors or defects, or to exceptions which do not affect the substantial rights of the parties.'

> "With this rule laid down for our guidance, we do not think it incumbent on us to reverse the judgment in this case for an erroneous ruling of the court, from the consequences of which the defendant saw fit to relieve himself by the exercise of his right of peremptory challenge." 1 Kan. at 473.

Other early caselaw and our early Code of Criminal Procedure show that automatic reversal for such errors was disfavored. See *The Territory v. Reyburn*, 1 Kan.

21

(Dassler's Ed.) 551, 555, 1860 WL 3188 (1860) ("The whole spirit of civil and criminal codes of practice alike is to disregard technicalities and observe the substance only."); General Statutes of Kansas, Code of Criminal Procedure Ch. 102, Section 274 (1868) ("[T]he court may grant a new trial for the following causes . . . When the court has misdirected the jury in a material matter of law.").

Multiple cases illustrate the point. For example, in *Gillett v. Corum*, 5 Kan. 608, 613, 1870 WL 557 (1880), we found two instructional errors. When asked to find the instructional errors harmless, we held "it was the right of the party defendant below to have his case submitted to the jury under proper instructions. This, as we have seen, was not done, and we should be going outside of our duty were we to decide that such a course of trial did not operate to his injury, *unless such fact clearly appears*, which does not in this record." (Emphasis added.) 5 Kan. at 614-15; see also *State v. Smith*, 13 Kan. 274, 298, 1874 WL 725 (1874) ("We are not certain that the instruction misled the jury, but we are not certain that it did not; and as it is clearly erroneous, on this ground alone we are constrained to direct a reversal of the judgment, and order a new trial in accordance with the motion of the appellant."). But, of special note for our current circumstances, we *declined* to reverse a conviction based on an erroneous instruction in *State v. Jansen*, 22 Kan. 498, 1879 WL 871 (1879). There, we once again were faced with an erroneous burglary definition. Specifically, the first jury instruction omitted the "unlawful entry" element of burglary. Yet we held the error was not prejudicial and was not ground for reversal because the fact of entry was undisputed and referenced elsewhere in the instructions, including instructions submitted by the defendant. 22 Kan. at 509-10.

The fact that errors under the common law jury right were reviewed under this "presumed prejudice" standard is demonstrated even more clearly in practice by 1884. In *State v. Wilgus*, 32 Kan. 126, 4 P. 218 (1884), the jury was instructed that there was

sufficient evidence to convict if the specific offense had been committed within the two years prior to the date alleged. However, the statute of offense had not existed for that long. The court noted:

> "That the instruction is erroneous as an abstract proposition, we think must be conceded, but whether it is materially erroneous, or whether the question has been properly saved, or is so presented to this court as to make the supposed error available to the defendant, are quite different questions. It is our opinion that the judgment of the court below cannot be reversed for the error contained in this instruction. . . . But under the other instructions and the facts of this case, was not the error contained in this instruction harmless?
>
> . . . .
>
> ". . . And further still, we cannot think that the error of the court below, in the present case and under the circumstances, could in the slightest degree have been prejudicial to the rights of the defendant." 32 Kan. at 127-29.

Thus, at ratification, errors striking at the core function of the jury—that is, errors recognized by the common law at ratification—did not require automatic reversal. Instead, the "inviolate" right included only a right to a presumption of prejudice on appeal; not a right to automatic reversal. In other words, though the language of section 5 is "uncompromising," the meaning of that language has preserved common-law boundaries—including the protections for the jury trial outcomes built into the appellate review process at the time of our Constitution's ratification. Unlike the *Harrell* court, we conclude that the preservation of the jury trial right as it existed prior to the ratification of the Constitution does not mandate automatic reversal even for the most serious kinds of errors impacting the core function of the jury.

The State's failure to instruct the jury on an element of the charged crime is therefore presumed prejudicial under section 5. But the State may rebut that presumption by showing that Gleason suffered no prejudice. Specifically, we presume prejudice from

23

the omission of "rude, insulting or angry" from the jury instructions. But doing so, we must determine whether the State has rebutted that presumption before we can decide whether Gleason's section 5 right was violated. See *Wilgus*, 32 Kan. at 127-29.

We agree with the panel that the punch Gleason threw at the officers was done in a "rude, insulting or angry" manner under the applicable battery statute, K.S.A. 2019 Supp. 21-5413(a)(2), (c)(3)(A).

> "Turning to the video, we are satisfied it is evident that the punch Gleason threw at Spencer was borne of ill feelings and intended to be 'rude, insulting or angry.' See K.S.A. 2019 Supp. 21-5413(a)(2), (c)(3)(A). To be sure, the recording captured Gleason as he rapidly approached Spencer and Towers, from Spencer's blindside, with his fists clenched at his sides. He then turned directly toward the officers and lashed out at Spencer while Spencer's attention was focused elsewhere. Spencer threw his arm up to try and deflect the blow and his glasses landed on the ground as a product of his fracas with Gleason. Gleason swung at Towers next and then attempted to flee across the dining hall, throwing a table at one point to stymie the officers' efforts to apprehend him. In our view, it is clear from the video that this was an unprovoked, hostile act that is undeniably rude or angry in nature. That is, it does not lend itself to an interpretation that Gleason's conduct was innocuous or otherwise undertaken as participation in harmless, jovial horseplay." *Gleason*, 2024 WL 392001, at *4.

We also echo the panel's observation that "Gleason's jury had the opportunity to acquit him based on his allegation that there was no physical contact, but it chose not to, nor did it view his actions as merely attempted battery." *Gleason*, 2024 WL 392001, at *5. Although Gleason disputed whether physical contact actually occurred, he did not dispute that his conduct was "rude, insulting or angry." And we find *nothing* in the record to support a contention that physical contact, if it occurred, was anything *but* "rude, insulting or angry." The State has sufficiently shown that Gleason was not prejudiced by the omitted instruction. Because this error was not prejudicial to Gleason, we therefore find no violation of Gleason's section 5 jury right.

24

*Cumulative error*

Finally, we address the panel's holding that reversal of Gleason's conviction was warranted under the doctrine of cumulative error. The panel found the prosecutor's comments focusing on Spencer's head injuries independently warranted reversal. And the panel found that reversal was also justified based on the cumulative prejudice that resulted from the prosecutor's comments and the legally erroneous jury instruction that failed to include every element of the criminal offense. *Gleason*, 2024 WL 392001, at *11-12.

Cumulative trial errors, when considered together, may require reversal of the defendant's conviction when the totality of the circumstances establish that a defendant was substantially prejudiced and denied the right to a fair trial. *State v. Alfaro-Valleda*, 314 Kan. 526, 551-52, 502 P.3d 66 (2022). The cumulative error rule does not apply if there are no errors or only a single error. *State v. Gallegos*, 313 Kan. 262, 277, 485 P.3d 622 (2021).

The only error here is the prosecutor's misstatement during rebuttal that "Gleason is guilty of aggravated battery of Officer Spencer." *Gleason*, 2024 WL 392001, at *11. Because the cumulative error doctrine does not apply when there is a single error, the panel's decision cannot stand. See *Gallegos*, 313 Kan. at 277.

Judgment of the Court of Appeals reversing the district court is reversed. Judgment of the district court is affirmed.

ROSEN and STANDRIDGE, JJ., concur in the result.

25